**APPENDIX A**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GREGORY O. DAVIS, SR. , et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:08-cv-00447 (KBJ/GMH) |
| | ) | |
| STEVEN TERNER MNUCHIN,[1] | ) | |
| in his official capacity as | ) | |
| Secretary of the United States | ) | |
| Department of the Treasury, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

This case involving dozens of incidents of alleged discrimination was originally filed in 2008 by nineteen plaintiffs, each of whom worked for the Secretary of the United States Department of the Treasury, a position currently filled by Steven Terner Mnuchin ("Defendant"), as police officers at the Washington, D.C. facility (the "D.C. Facility") of the Bureau of Engraving and Printing ("BEP"). Those nineteen plaintiffs have been winnowed to two: Aileen Joy, who proceeds *pro se*, and Gregory O. Davis, Sr. ("Plaintiffs"), but the operative amended complaint still alleges nearly identical claims. Specifically, the claims remaining following a decision on Defendant's motion to dismiss in January 2013, *see Davis v. Geithner*, 919 F. Supp. 2d 8 (D.D.C. 2013), allege disparate treatment, harassment, and a hostile work environment based on Plaintiffs' race, as well as retaliation and retaliatory harassment, all in violation of the Title VII of the Civil

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Steven Terner Mnuchin, who currently serves as the Secretary of the United States Department of the Treasury, will be substituted for the prior Secretary, Jacob J. Lew.

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[2] ECF No. 25, ¶¶ 80–87. Now ripe for adjudication are Defendant's motions for summary judgment as to all of the claims of each Plaintiff (ECF No. 127-2; ECF No. 128-2) and Plaintiff Gregory Davis's motion pursuant to Rule 56(d) of the Federal Rules of Civil Procedure (ECF No. 149; ECF No. 149-3).[3] Upon consideration of the parties' motions, the memoranda in support thereof and opposition thereto, and the evidentiary record submitted by the parties to supplement their filings, the undersigned recommends denying Plaintiff Davis' Rule 56(d) motion, and granting Defendant's motions for summary judgment in their entirety.

## I. BACKGROUND

### A. Procedural History

Because the procedural history of this ten-year-old case is relevant to the resolution of Defendant's motions for summary judgment, it will be useful to provide some detail.

This action alleging racial discrimination in employment was originally filed in March 2008 by nineteen African-American police officers at the BEP's D.C. Facility, which has a predominantly African-American police force. On April 16, 2009, those nineteen plaintiffs filed

---

[2] Claims in the amended complaint alleging violations of 42 U.S.C. § 1981 were dismissed at the request of the parties. *See Davis v. Geithner*, 919 F. Supp. 2d 8, 10 n.2 (D.D.C. 2013). Claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*; and the Equal Pay Act, 29 U.S.C. § 206 *et seq.*, which were putatively raised in a court-ordered "notice of clarification," ECF No. 46; ECF No. 51, are dealt with briefly below in Section III.D.

[3] The most relevant documents for the purposes of these motions are (1) the First Amended Complaint (ECF No. 25); (2) Scheduling Order dated July 23, 2013 (ECF No. 46); (3) Plaintiffs' Notice of Clarification (ECF No. 51); (4) Defendant's Motion for Summary Judgment (Gregory Davis) and attachments (ECF No. 127 through ECF No. 127-8); (5) Defendant's Motion for Summary Judgment (Aileen Joy) and attachments (ECF No. 128 through ECF No. 128-6); (6) Letter of Plaintiff Aileen Joy filed Sept. 1, 2017 (ECF No. 130); (7) Plaintiff Gregory Davis' Response to Order of the Court (ECF No. 133); (8) Plaintiff Gregory Davis' Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and attachments (ECF No. 149 through ECF No. 149-19); (9) Plaintiff Aileen Joy[']s[] Objection to Defendant[']s[] Motion for Summary Judgment and attachment (ECF No. 150 through ECF No. 150-1); (10) Defendant's Reply in Support of its Motion for Summary Judgment (Gregory Davis) (ECF No. 157); (11) Defendant's Reply in Support of its Motion for Summary Judgment (Aileen Joy) (ECF No. 151); (12) Plaintiff Joy's Response to Order of the Court (ECF No. 162); and Defendant's Supplemental Reply in Support of its Motion for Summary Judgment (ECF No. 163).

an amended complaint (the "Amended Complaint") against the then-Secretary of the Treasury, Timothy Geithner; David Lindsey, the former Chief of the Police Operations Division at the BEP; and Christopher Cooch, the former Commander of the Police Operations Division. ECF No. 25, ¶¶ 5–7. The Amended Complaint pleaded causes of action under Title VII and 42 U.S.C. § 1981 for disparate treatment and a hostile work environment based on race, as well as retaliation. *Id.*, ¶¶ 80–96. More specifically, the Amended Complaint alleged that, beginning in 2002, the plaintiffs were

> denied equal pay for services performed, denied promotions, denied basic Agency required rights, bypassed for assessment and pay increases, retaliated against because of their lawful actions and denied fair treatment because they testified against the Agency in lawsuits or complaints filed against the Agency and because they are all Minorities.

*Id.*, ¶ 9. The defendants moved to dismiss the Amended Complaint in part. ECF No. 31. In January 2013, at which time there were seventeen plaintiffs remaining, the Court granted the motion in part; it dismissed, in relevant part, the individual defendants as improperly sued, the section 1981 claims (at the request of the parties), and some of Plaintiff Davis' claims that he had not been selected for promotions as retaliation for his filing of complaints against the Treasury Department, finding them unexhausted. *See Davis*, 919 F. Supp. 2d at 10 & nn.1–2, 13–14, 16.

The Amended Complaint's remaining substantive allegations of discrimination fall into four broad categories that assertedly support one or more of Plaintiffs' claims (although it is not always clear which allegations are designed to support which claims).[4] The first group contains allegations that Plaintiffs were treated differently than the police officers at the BEP's other facility in Fort Worth, Texas (the "Texas Facility"), which allegedly has a predominantly Caucasian police

---

[4] This outline omits those allegations that clearly involved only plaintiffs that have since been dismissed.

force. According to the Amended Complaint, supervisors, in particular Chief Lindsey and Commander Cooch,

(1)     eliminated or failed to institute at the D.C. Facility, but retained at the Texas Facility, functions and policies that created the opportunity for officers to receive additional pay and on-the-job training, specifically by disallowing officers at the D.C. Facility from

    (a)     manning the Communications Police Operations Center (*id.*, ¶ 14);

    (b)     guarding the doors (*id.*, ¶¶ 15, 50);

    (c)     participating in "money shows" (*id.*, ¶ 20);

    (d)     receiving "CCN" numbers[5] (*id.*, ¶ 23);

    (e)     carrying guns while off-duty (*id.*, ¶¶ 24, 71);

    (f)     being classified as federal police officers (*id.*, ¶¶ 34, 48, 71);

    (g)     issuing traffic violation tickets (*id.*, ¶ 32);

    (h)     continuing to work their historical number of work hours (*id.*, ¶ 18); and

    (i)     receiving reimbursement for a portion of the cost of their liability insurance (*id.*, ¶ 47); and

(2)     instituted at the D.C. Facility, but not at the Texas Facility, policies designed to inconvenience or endanger officers, such as

    (a)     implementing a three-level supervisorial hierarchy consisting of a Deputy Commander, a Commander, and a Chief (*id.*, ¶ 17);

    (b)     changing the promotional process (*id.*, ¶ 19);

    (c)     denying them the benefit of the "two man rule"[6] (*id.*, ¶ 21);

    (d)     denying them the use of patrol cars (*id.*, ¶ 33);

---

[5] The record does not illuminate what a CCN number is, or why it is important.

[6] Under the "two man rule," officers performed their duties in groups of two (ECF No. 127-8 at 6–7), which purportedly protected them from attacks (ECF No. 25, ¶ 21).

4

(e)     initiating new security protocols at the entrances and exits to certain secure areas at the D.C. Facility (*id.*, ¶ 35);

(f)     requiring them to wear their reflective vests during outside foot patrols (*id.*, ¶ 36);

(g)     denying them access to the Communications Police Operations Center (*id.*, ¶ 40);

(h)     denying them access to certain sections of the D.C. Facility, such as the "Currency Section," in part to deter theft (*id.*, ¶¶ 16, 46);

(i)     threatening them with discipline if they failed to "take action" when they "observed an incident" (*id.*, ¶ 52); and

(j)     changing their work schedules (*id.*, ¶ 63).

Second, the Amended Complaint alleges that supervisors denied Plaintiffs Joy and Davis promotions. Specifically, Commander Cooch allegedly denied Plaintiff Joy the opportunity to apply for a promotion in 2005. *Id.*, ¶ 39. Defendant Davis was passed over for promotion on four occasions, in connection with the following certifications: 2002-075-AJC; 2003-007-AJC; 2004-04-LJH; and 2005-043-RYM. *Id.*, ¶¶ 42–43, 64, 70, 72–73; *Davis*, 919 F. Supp. 2d at 13–14. Moreover, Commander Cooch allegedly ordered promotional ceremonies only when Caucasian officers were promoted. ECF No. 25, ¶ 45.

Third, supervisors allegedly retaliated against Plaintiffs in other ways, such as by

(1)     terminating Plaintiff Joy, who was later reinstated but not fully compensated (*id.*, ¶ 26);

(2)     ordering paid administrative leave for officers in the Union, stripping them of their uniforms, and assigning them menial duties (*id.*, ¶ 27);

(3)     ordering an investigation of Plaintiff Davis for allegedly making "unpleasant comments" during a roll call (*id.*, ¶ 29);

(4)     improperly seizing Plaintiff Davis' weapon (*id.*, ¶ 30);

5

(5)      improperly investigating and interrogating Plaintiff Davis in March 2005 when he allegedly informed other officers that supervisors had placed hidden cameras in certain areas of the D.C. Facility (*id.*, ¶ 41);

(6)      contracting out certain security functions to employees of an outside security service, one of whom entered the D.C. Facility with a loaded weapon, endangering Plaintiff Davis (*id.*, ¶ 51);

(7)      denying Plaintiff Davis the opportunity to act as a Control Tactic Instructor (*id.*, ¶ 57);

(8)      threatening "revenge" and "retaliation" against Davis for his lawful complaints (*id.*, ¶¶ 55–56); and

(9)      excluding Plaintiffs from the Training Division (*id.*, ¶ 58).

Fourth, the Amended Complaint identifies a number of miscellaneous incidents, generally traceable to Commander Cooch:

(1)      Commander Cooch "issued a racial e-mail as a training tool" when he forwarded a management training program referring to monkeys (*id.*, ¶ 13);

(2)      Commander Cooch placed Plaintiff Joy on administrative leave, suspended her law enforcement authority, and told her she was unfit to serve as a police officer because she allegedly submitted false medical information in connection with a worker's compensation claim (*id.*, ¶ 28);

(3)      supervisors excluded officers from eligibility for "early out" retirement (*id.*, ¶ 53);

(4)      supervisors, including Commander Cooch, denied Plaintiff Davis overtime wages and differential pay (*id.*, ¶¶ 59–61, 67);

(5)      Commander Cooch instituted "New Shift Reporting Times" in October 2004 (*id.*, ¶ 62);

(6)      Commander Cooch charged Plaintiff Davis with being absent without leave for 16 hours when he sought differential pay for night duty (*id.*, ¶ 67); and

(7)      supervisors required male and female officers to use the same locker rooms, contributing to a hostile work environment (*id.*, ¶ 74).

After the motion to dismiss was resolved, and at the request of the parties, an initial scheduling conference was postponed to allow the parties to confer about limiting the issues,

6

identifying the remaining plaintiffs, and settlement. ECF No. 42. In July 2013, in compliance with an order of the Court (ECF No. 44), the parties filed a joint statement pursuant to Local Civil Rule 16.3 (ECF No. 45). Finding the plaintiffs' description of their case to be unacceptably general, on July 23, 2013, the Court ordered the plaintiffs to file "a notice of clarification that lists each remaining plaintiff, specifies which claims (*e.g.* racial discrimination, retaliation, hostile work environment, unlawful termination, failure to promote, denial of benefits) apply to each plaintiff, and provides the statutory basis for each claim." ECF No. 46 at 1–2. The notice of clarification filed on November 6, 2013, listed seventeen plaintiffs, including Plaintiff Davis and Plaintiff Joy, and indicated that each of them asserted claims under Title VII, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and the Rehabilitation Act, 29 U.S.C. § 791, *et seq.*, as well as various implementing regulations.[7] ECF No. 51.

Between June 2014 and May 2017, fifteen plaintiffs were dismissed from the case, leaving only Plaintiff Davis and Plaintiff Joy. ECF No. 127-2 at 2–3. Meanwhile, the plaintiffs' attorney withdrew from his representation in June 2015. Minute Order dated June 30, 2015. Plaintiff Joy

---

[7] Claims other than alleged discrimination based on racial animus or retaliation are not properly before the Court. The Amended Complaint in this matter alleged only discrimination based on race and retaliation in violation of various provisions of Title VII. ECF No. 25, ¶¶ 80–96. Nowhere in the Amended Complaint is there a mention of the ADEA, the Equal Pay Act, or the Rehabilitation Act. Nowhere in the Amended Complaint is there an allegation related to the age of Plaintiffs, any disability, or a difference in pay based on gender. Nor can the order of July 23, 2013, be construed as an invitation to add claims to the Amended Complaint through the notice of clarification. In this and all civil actions, the complaint operates to delineate the claims the plaintiff has brought. *See, e.g.*, Fed. R. Civ. P. 8(a) (requiring, among other things, "a short and plain statement of the claim showing the pleader is entitled to relief"). Any pre-trial additions or modifications to those claims must be made in a motion to amend pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure. Indeed, the Court's order directing filing of the notice of clarification also set a schedule requiring that any "[m]otion to join parties and/or amend pleadings" be filed by October 18, 2013. ECF No. 46 at 1. No such motion to amend was filed. Nor could the Amended Complaint be amended anew by raising new legal claims in briefs filed in connection with motions for summary judgment. *See, e.g.*, *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that the Plaintiff cannot amend her Amended Complaint by the briefs in support of or in opposition to a motion for summary judgment."). Therefore, any claims other than those alleging discrimination based on race or retaliation pursuant to Title VII are not properly before the Court.

chose to proceed *pro se* (ECF No. 98), while new counsel appeared on behalf Plaintiff Davis (ECF No. 75; ECF No. 115).

The matter was referred to the undersigned for full case management in October 2015. Minute Order dated Oct. 30, 2015. A discovery hearing was scheduled for September 12, 2017, to discuss alleged gaps in Defendant's production of documents and written discovery responses. Minute Order dated Aug. 22, 2017. Prior to the discovery hearing, Defendant filed the two motions for summary judgment—one targeting Plaintiff Davis' evidence, the other targeting Plaintiff Joy's evidence—at issue here, complete with the statements of undisputed material facts required by Rule 56(c) of the Federal Rule of Civil Procedure and this Court's Local Civil Rule 7(h). ECF No. 127; ECF No. 127-1; ECF No. 128; ECF No. 128-1.

As to the discovery dispute, Plaintiff Davis contended that Defendant's responses to certain interrogatories and document requests were deficient, and sought supplementation with regard to seven areas of evidence: (1) facts and documents in support of all defenses asserted; (2) facts explaining the reasons that Plaintiff Davis was not selected for certain promotions; (3) facts regarding Defendant's document retention policies; (4) documents pertaining to equal employment opportunity ("EEO"), anti-harassment, or discrimination training for supervisors; (5) documents pertaining to Plaintiff Davis' EEO complaints; (6) documents relating to the wage scale for positions Defendant Davis applied for; and (7) documents related to Commander Cooch's separation from the BEP.[8] ECF No. 131. At the hearing, Defendant represented repeatedly that all existing documents had been produced in connection with most of the document requests at

---

[8] At the hearing, Plaintiff abandoned her request for supplementation of an interrogatory seeking statements taken or obtained by Defendant in connection with the Amended Complaint.

issue, but agreed to check again and to supplement any deficient responses.[9]  Plaintiff reserved the right to seek preclusion of evidence or additional discovery if Defendant's supplementation was inadequate.  Defendant updated the Court on October 10, 2017, asserting that he had supplemented his responses to the document requests—he had produced an additional 1,000 pages of documents (ECF No. 138 at 1)—and interrogatories that Plaintiff Davis had contended were deficient.  ECF No. 144.

Plaintiff Davis sought and was granted two extensions of time to file his opposition to Defendant's motion for summary judgment to allow his counsel to review the supplemental discovery provided by Defendant and to draft his submissions.  ECF No. 145; ECF No. 146; ECF No. 147; ECF No. 148.  He filed his opposition on November 22, 2017, arguing, in part, that Defendant's motion for summary judgment should be denied pursuant to Rule 56(d) of the Federal Rules of Civil Procedure because Defendant had "failed to provide critical information" to allow Plaintiff Davis to "effectively oppose" the motion and Plaintiff Davis "did not have the opportunity . . . to follow up on facts and evidence first identified in [Defendant's] motion for summary judgment."  ECF No. 149 at 3–4.  He requested the opportunity to brief the imposition of sanctions against Defendant, specifically suggesting an adverse evidentiary inference.  *Id.* at 3–4.  He nevertheless opposed the motion for summary judgment on the merits, as well.

Plaintiff Joy's opposition to Defendant's motion for summary judgment was filed by the Court on November 22, 2017.  ECF No. 150.  Noting that Defendant had not provided Plaintiff Joy with a notice pursuant to *Neal v. Kelly*, 963 F.2d 453 (D.C. Cir. 1992),[10] the Court on August

---

[9] As neither party ordered a transcript of the hearing, it does not appear on the docket.  However, the undersigned has reviewed a rough transcript of the hearing that was provided to the Court.

[10] In *Neal*, the D.C. Circuit held that, when faced with a motion for summary judgment, a *pro se* litigant must be informed that "any factual assertion in the movant's affidavits will be accepted . . . as being true unless the [non-moving party] submits [her] own affidavits or other documentary evidence contradicting the assertion."  963 F.2d at 456.

8, 2018, provided the required notice and gave Plaintiff Joy additional time to supplement her opposition. ECF No. 161. She filed a supplement on September 14, 2018, and Defendant responded on September 25, 2018. ECF No. 162; ECF No. 163.

## B.     Factual Background[11]

### 1.     Organization of the Bureau of Engraving and Printing

The BEP, a component of the Department of the Treasury, manufactures U.S. currency and other securities. ECF No. 127-1, ¶ 1. The BEP is headed by a single director. ECF No. 149-1 at 1; ECF No. 149-4. It has two facilities, the D.C. Facility and the Texas Facility. ECF No. 127-1, ¶ 2. David Lindsey, an African-American male, was hired as Commander of the Police Operations Division for the D.C. Facility in 1995. *Id.*, ¶ 4. In that position, he was responsible for overseeing the uniformed police officers at the D.C. Facility. *Id.*, ¶ 5. During the time period relevant for this case, the Police Operations Division included male and female Caucasians, African-Americans, and Hispanics, although it was predominantly made up of African-American males. *Id.*, ¶ 7. Plaintiff Davis began his employment as a police officer with the BEP in 1992. *Id.*, ¶ 45. Plaintiff Joy began her employment as a police officer with the BEP in 2000, was placed on administrative leave in December 2003, terminated in August 2004, and reinstated in January 2006. ECF No. 128-5 at 16, 24; ECF No. 128-6 at 8–9.

In 2002, Lindsey was promoted to the position of Chief, Office of Security, with responsibility for five security divisions at the D.C. Facility, including the Police Operations Division and the Police Training Division. ECF No. 127-1, ¶¶ 9–10. Although he set broad

---

[11] The following factual allegations are undisputed (or deemed undisputed) unless otherwise noted. Where a fact from Defendant's statement of undisputed material facts is explicitly undisputed, the undersigned generally cites the statement of undisputed material facts. In other circumstances, such as when a fact is insufficiently disputed because, for example, either Plaintiff's objection fails to cite record evidence or the evidence cited does not support the objection, the undersigned cites the record evidence supporting the fact.

security policies for the BEP that impacted all employees, contractors, and visitors, Chief Lindsey did not hire, promote, or assign work to employees in the Texas Facility security office; rather the Plant Manager for the Texas Facility had those responsibilities.[12] ECF No. 127-3 at 2, ¶ 9; ECF No. 127-5 at 1. Similarly, Chief Lindsey was not involved in the selection process to fill police corporal or sergeant vacancies. ECF No. 127-1, ¶ 17. Chief Lindsey appointed Christopher Cooch as the Commander for the Police Operations Division in December 2002. *Id.*, ¶ 11. Commander Cooch did not have oversight of police operations at the Texas Facility; rather, his job focused on overseeing uniformed police officers in the Police Operations Division at the D.C. Facility.[13] ECF No. 127-3, at 2, ¶ 4; *id.* at 3, ¶ 7. Commander Cooch, Chief Lindsey, and other division managers coordinated to determine manpower needs and the most cost-effective means to utilize available resources. ECF No. 127-1, ¶ 18.

### 2. Policies Affecting the BEP's Police Operations Division

At some point during his tenure as Chief,[14] because of budget and manpower issues, Chief Lindsey sought and received authorization from senior management to permit the Office of Security to contract out certain "non-critical" functions that did not require carrying a weapon.

---

[12] Plaintiff Davis disputes this fact, citing a document reflecting the reporting structure of the Office of Security that shows that the security division at the Texas Facility reported both to the Plant Manager and to the Office of Security, of which Lindsey was Chief. ECF No. 149-1 at 2; ECF No. 127-5. However, that document is consistent with Chief Lindsey's assertion that he instituted broad security policies for the BEP and does not undermine his assertion that he did not have day-to-day operational control of the Texas Facility's security division. ECF No. 127-3 at 2, ¶ 9. Plaintiff Davis' assertion that he "did not have the opportunity to conduct discovery on the reporting structure of the Texas [F]acility" (ECF No. 149-1 at 2, n.1) is addressed below in the Section III.A, which concerns Plaintiff's motion under Rule 56(d) of the Federal Rules of Civil Procedure.

[13] Plaintiff Davis disputes this fact, citing a document reflecting the executive structure of the BEP, which shows that the D.C. Facility and the Texas Facility fell under the leadership of a single director. ECF No. 149-1 at 1, 3; ECF No. 149-4. However, the fact that the BEP was led by a single director does not undermine Commander Cooch's assertion that he did not have oversight of the Texas Facility. ECF No. 127-3 at 8, ¶¶ 4–5.

[14] Defendant's statements of undisputed facts and the materials on which they rely are oddly miserly with dates. According to the Amended Complaint, the contracting at issue occurred either in February 2003 or in August 2005. ECF No. 25, ¶¶ 15, 50.

11

ECF No. 127-1, ¶¶ 19–20; ECF No. 127-3 at 3, ¶ 14; *id.* at 12, ¶ 22. Ultimately, the D.C. Facility contracted with DECO, a private security firm, to provide workers to operate the magnetometer as the belongings of employees and visitors were screened upon entry to the building. ECF No. 127-1, ¶¶ 20–21. The contractors did not enforce security regulations; if they observed anything suspicious as part of their screening responsibilities, they were directed to alert the police officers assigned to the post. *Id.*, ¶¶ 21–22. In November 2005, a DECO contractor entered the D.C. Facility with a firearm in his gym bag and Plaintiff Davis discovered the weapon while performing his assigned duties. ECF No. 25, ¶ 51, ECF No. 127-1, ¶ 23.

As part of a public education awareness campaign, the BEP's Office of External Relations participated in "money shows" to inform the public about new currency that BEP issued. ECF No. 127-1, ¶ 25. The Office of External Relations had asked for a uniformed BEP officer to accompany the currency products, but at some point informed Commander Cooch that officers were no longer needed because personnel from the Product Security Branch (which was part of the Product Integrity Division rather than the Police Operations Division) would accompany the currency. ECF No. 127-1, ¶¶ 25–26; ECF No. 127-5 at 1. In August 2003, Commander Cooch stopped assigning BEP officers to money shows. ECF No. 25, ¶ 20; ECF No. 127-1, ¶ 26.

Upon the passage of H.R. 218, a bill intended to "exempt qualified current and former law enforcement officers from State laws prohibiting the carrying of concealed weapons," H.R. Rep. No. 108-560, at 16, that was codified at 18 U.S.C. §§ 926B, 926C, the Fraternal Order of Police, the union that represented officers in the BEP's Police Operations Division, inquired about the statute's application to BEP officers. ECF No. 127-1, ¶ 28. In August 2004, the legal departments of the Treasury Department and the BEP determined that the statute did not apply to officers in the BEP Police Operations Division, and that the law did not supersede federal law or BEP

12

regulations, which prohibited BEP officers from carrying personal weapons on BEP property. ECF No. 25, ¶ 24; ECF No. 127-1, ¶¶ 28–29.

        3.      Facts Surrounding the September 17, 2004 Email from Commander Cooch and Other Allegedly Related Communications

On September 17, 2004, Commander Cooch sent an email to Corporal Joseph Guion, Captain Alonzo Tate, and Sergeant Edward Williams, each of whom is an African-American male, and to Lieutenant Meinrad Guagliardo and Lieutenant Glenn Williams, two Caucasian males, entitled "Does your company work this way?" ECF No. 127-1, ¶ 41; ECF No. 127-3 at 19. The email described an apparent experiment involving five monkeys in a cage with a set of stairs leading to a banana on a string. ECF No. 127-3 at 19. When one monkey steps on the stairs, all of the monkeys are sprayed with cold water. *Id.* According to the description, after that is repeated a few times, the monkeys will try to prevent anyone from approaching the stairs. *Id.* That behavior—that is, the attempt to prevent any monkey from approaching the stairs—continues even when the cold water is no longer sprayed, and even after each of the original five monkeys has been replaced by a new monkey who has never been punished for approaching the stairs. *Id.* The email ends with the following sentences: "Nevertheless, no monkey ever again approaches the stairs to try for the banana. Why not? Because as far as they know, that's the way it's always been done around here. And that, my friends, is how a company policy begins." *Id.*

On January 14, 2005, Commander Cooch issued a memorandum to the BEP police force, "to express regret that [the] purpose [of the email] was misunderstood by some." *Id.* at 20. The memorandum explained that "[t]he illustration used in the email is one of a number of widely used management training tools used to illustrate the need for receptiveness to change in organizations." *Id.* Commander Cooch asserted that he sent the email in order to "obtain ideas[] from all ranks[] and to remind them that we are all here for a common goal and that we have to work as a team to

13

further our mission of continued progress and excellence." *Id.* The memorandum concluded by expressing that Commander Cooch was "pained to learn that the intended message of the email was misunderstood as offensive by some," stating the he "deeply regret[ted] that anyone inaccurately interpreted the email," and reiterating his commitment "to the diversity of the Bureau's police force and of the Agency, and to ensuring that everyone is treated with dignity and respect." *Id.* at 21.

On February 2, 2005, Plaintiff Davis filed a class action complaint with the Department of Treasury Equal Employment Opportunity Office on behalf of African-American employees at the D.C. Facility alleging claims of harassment, hostile work environment on the basis of race, and retaliation for protected activity. ECF No. 157-2 at 3. The complaint was based on Commander Cooch's September 17, 2004 email and alleged that the communication was "racially offensive to African-Americans." *Id.* at 5. The Administrative Judge dismissed the complaint in June or July 2005, "for failure to meet the prerequisites for class certification."[15] *Id.* at 6.

On June 2, 2006, Commander Cooch sent an email to a number of people, including some who appear to have had federal government email addresses, that repeated certain alleged facts purportedly from the Los Angeles Times regarding undocumented immigrants. It claimed, for instance, that "95% of warrants for murder in Los Angeles are for illegal aliens," that "[n]early 60% of all occupants of HUD properties are illegal," and that "[n]early 25% of all inmates in California detention centers are Mexican nationals here illegally"; the email ended with the line "AND THESE ARE THE PEOPLE DEMANDING AMNESTY!!!" ECF No. 149-16.

---

[15] The date of the Administrative Judge's decision is unclear. A certificate of service indicates it was sent on June 9, 2005, to Plaintiff Davis, his counsel, and officials from the Treasury and the BEP. ECF No. 157-2 at 2. The opinion appears to have been sent via facsimile from the Equal Employment Opportunity Commission ("EEOC") to a number in the District of Columbia on June 28, 2005. ECF No. 157-2 at 1. Another certificate of service indicates that the decision and documents informing Plaintiff Davis of his appeal rights were sent to Plaintiff Davis, his counsel, and various officials on July 28, 2005. *Id.* at 13. Defendant apparently misreads that date as July 25, 2005. ECF No. 157-1 at 3. In any case, the precise date of the decision is immaterial to the resolution of the motions here.

On December 11, 2006, Plaintiff Davis sent a memorandum to Matthew Richburg, a captain in the company to which Plaintiff Davis was attached, and copied to Russell U. Carpenter, "Manager Labor-Management Relations Division" and Charles Smith, "FOP/Union Chairman." ECF No. 149-17 at 1, 3. The memorandum alleged that, on November 16, 2006, Commander Cooch had ordered Sergeant Virginia Tisino to tell Plaintiff Davis that "the other day I got dressed I had to come down and get my weapon, I am always duty ready, because I had a banana in my holster." *Id.* at 1. Plaintiff Davis asserted that the comment was related to Commander Cooch's September 17, 2004 email, and that the two incidents indicated that Commander Cooch believed that "Blacks are monkeys and the monkeys who get in his way are the monkeys he is targeting by taking out the old and putting in the new." *Id.* at 3. He further alleged that the comment that Commander Cooch was "always duty ready" was a "threat upon [his] personal safety." *Id.*

4.      Facts Relevant to Plaintiff Davis' Job Vacancy Applications

a.      *Vacancy 2002-075-AJC*

In June 2002, Plaintiff Davis applied for a promotion to the rank of sergeant pursuant to BEP job vacancy announcement 2002-075-AJC (the "2002 Vacancy"). ECF No. 127-1, ¶ 59; ECF No. 127-5 at 12. He was identified as one of eight "best qualified" candidates, each of whom was African-American. ECF No. 127-5 at 11–12. The candidates were scored, and Plaintiff Davis received a score of 20, tying him for sixth place; the highest score was a 23. ECF No. 127-1, ¶¶ 62–63. The Acting Commander of the Police Operations Division was given two candidates to choose from, but he failed to make a selection within the requisite 90 days. *Id.*, ¶¶ 65–66. In September 2002, on the advice of the Office of Human Resources, Chief Lindsey cancelled the vacancy without promoting any candidate. ECF No. 127-1, ¶¶ 66–67; ECF No. 127-5 at 23.

15

In November 2005, Plaintiff Davis filed an unfair labor practice charge with the Washington Regional Office of the Federal Labor Relations Authority ("FLRA"), a tribunal that governs labor-management relations of federal employees covered by collective bargaining agreements, *see Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 606 F.3d 780, 783 (D.C. Cir. 2010), regarding this and other non-selections. ECF No. 127-5 at 13–14. However, the Regional Director of the FLRA found the claim based on this non-selection untimely. *Id.* at 18.

### b.    Vacancy 2003-007-AJC

In February 2003, Plaintiff Davis again applied for a promotion to sergeant pursuant to vacancy number 2003-007-AJC (the "2003 Vacancy"). ECF No. 127-1, ¶ 70. Commander Cooch was the selecting officer for that vacancy. *Id.*, ¶ 71. Plaintiff Davis was identified as one of eleven best qualified candidates, nine of whom were African-American males, one of whom was an African-American female, and one of whom was a Hispanic male. *Id.*, ¶ 73. Commander Cooch, who was new to the job and unfamiliar with the candidates, interviewed each of the eleven best qualified candidates. *Id.*, ¶¶ 72, 76–77. On March 14, 2003, Commander Cooch selected four candidates—three African-American males, one of whom had engaged in protected activity, and one African-American female—identifying them as the best qualified of the eleven he had interviewed.[16] *Id.*, ¶ 78. This non-selection is also a subject of Plaintiff Davis' November 2015

---

[16] Plaintiff Davis asserts that Commander Cooch selected the four candidates because they had "not complained of discrimination or who had not asserted allegations of hostile work environment based on his 'Monkey' email," citing, as support, Plaintiff Davis' own declaration, and a complaint to the Office of Equal Employment Opportunity Bureau Resolution Center dated October 22, 2004. ECF No. 149-1, at 5–6, ¶ 78. The cited evidence does not support his assertions. First, Davis' declaration merely states that he "believe[s]" that racially discriminatory animus and retaliation prevented his promotions. ECF No. 149-2, ¶ 4. Moreover, both the cited complaint and the so-called "monkey email" post-date Plaintiff Davis' non-selection for this promotion. Finally, Plaintiff Davis cites no evidence to undermine the assertion that one of the four officers selected as best qualified had engaged in protected activity. ECF No. 149-1 at 6, ¶ 80.

unfair labor practice charge, and the claim based on it was similarly found untimely. ECF No. 127-5 at 14, 18. In June 2007, Plaintiff Davis initiated contact with an EEO counselor and in July 2007 filed a formal complaint alleging discrimination in connection with this and other non-selections. ECF No. 127-1, ¶¶ 86–87. His EEO non-selection claim as to the 2003 Vacancy was similarly dismissed as untimely. ECF No. 127-6 at 18–19.

c.      Vacancy 2004-004-LJH

In October 2003, Plaintiff Davis applied for a promotion under vacancy number 2004-004-LJH (the "2004 Vacancy"). ECF No. 127-1, ¶ 88. Commander Cooch was the selecting officer, and sixteen out of the seventeen candidates who applied for the promotion were interviewed and scored by a panel of three African-American males.[17] ECF No. 127-3 at 14, ¶¶ 32–33; ECF No. 127-7 at 2. The candidates that made the best-qualified list were all African-American males. ECF No. 127-1, ¶ 91. The selection was made on December 8, 2003. *Id.*, ¶ 97. The two candidates who were selected for the job vacancies received the highest scores of 22; Davis received a score of 19. *Id.*, ¶¶ 94–95.

On May 21, 2004, Davis filed an unfair labor practice charge with the Regional Director of the FLRA related to his non-selection for the vacancy. *Id.*, ¶ 98. On June 21, 2004, the Regional Director declined to issue a complaint for this charge and informed him that he had thirty days, that is, until July 21, 2004, to appeal the decision. *Id.* ¶¶ 99–100. On September 21, 2004, Davis

---

[17] Plaintiff Davis asserts that Commander Cooch did not interview the candidates because he "did not believe he needed to create an impediment to [Davis's] selection at that point," citing a paragraph from Plaintiff Davis' declaration. ECF No. 149-1 at 7, ¶ 96. However, in the cited paragraph Plaintiff Davis states that he was "among the most qualified" applicants for the promotions he sought, that he "trained many who were subsequently promoted" over him, that the 2002 Vacancy was not filled, and that he "grieved or sought EEO counseling on many of the[] non-selections, if not all" but does not have evidence or specific recollections of those grievances or complaints. ECF No. 149-2, ¶ 7.

appealed the decision, but there is no evidence in the record that the untimely appeal was addressed or resolved. *Id.*, ¶¶ 101–02.

In June 2007, Plaintiff Davis initiated contact with an EEO counselor and in July 2007 filed a formal complaint alleging discrimination in connection with this and other non-selections.[18] *Id.*, ¶¶ 103–04. His non-selection claim as to the 2004 Vacancy was dismissed as untimely. ECF No. 127-6 at 18–19.

### d.     Vacancy 2005-043-RYM

Pursuant to vacancy number 2005-043-RYM (the "2005 Vacancy"), another sergeant position, Plaintiff Davis was one of fifteen "best qualified" candidates, comprising ten African-American individuals, two Caucasian individuals, and three Hispanic individuals. ECF No. 127-1, ¶¶ 105–06. Each was interviewed and scored by a merit promotion panel. ECF No. 127-3 at 15, ¶ 39; ECF No. 127-7 at 16–17. The three highest-scoring candidates received scores of 22; three other individuals, including Plaintiff Davis, received the second highest scores of twenty. ECF No. 127-7 at 16–17. On May 12, 2005, Commander Cooch selected the three candidates with the highest scores to fill the vacancies, one African-American individual, one Caucasian individual, and one Hispanic individual.[19] ECF No. 127-3 at 15, ¶¶ 42–43.

Davis knew that he was not selected for the promotion under job vacancy announcement 2005-043-RYM by May 25, 2005, at the latest. ECF No. 127-1, ¶ 108. He filed an unfair labor

---

[18] Plaintiff Davis suggests that that the informal EEO contact in 2007 was not the first time he had complained about this non-selection. ECF No. 149-1 at 7, ¶¶ 103–04. Plaintiff cites a "class complaint" dated October 22, 2004, from BEP police officer Arthur Haynesworth complaining about discrimination by Commander Cooch, and a memorandum dated February 12, 2004, from Plaintiff Davis addressed to an EEO counselor. ECF No. 149-1 at 7, ¶¶ 103–04; ECF No. 149-7; ECF No. 149-8. However, neither of those documents mentions the 2004 Vacancy non-selection of Plaintiff Davis.

[19] Plaintiff Davis' hypothesis that Commander Cooch selected those candidates because they had not complained of discrimination (ECF No. 149-1 at 5, ¶ 78; *id.* at 7, ¶ 107) does not undermine the fact that the three candidates chosen had the highest scores.

18

practice charge with the Regional Director FLRA on November 18, 2005, challenging this non-selection. *Id.*, ¶ 109. On August 1, 2007, the Regional Director issued a decision declining to issue a complaint because the BEP had not committed an unfair labor practice. *Id.*, ¶ 110. There is no record showing that Davis appealed this decision. *Id.*, ¶ 112.

Plaintiff Davis initiated EEO contact related to this non-selection on June 4, 2007, and filed a formal EEO complaint in July 25, 2007. *Id.*, ¶ 113. His EEO non-selection claim as to the 2005 Vacancy was dismissed as untimely. ECF No. 127-6 at 18–19.

5.      Facts Relevant to Plaintiff Joy's Termination and Reinstatement

In the fall of 2003, Commander Cooch received information from the Personnel Security Division that Plaintiff Joy might have submitted false medical documentation in connection with a workers' compensation claim. ECF No. 128-4 at 17, ¶ 49. He informed Chief Lindsey, who asked his deputy to direct the Personnel Security Division to investigate. *Id.* at 5, ¶ 24. Neither Chief Lindsey nor Commander Cooch was involved in the investigation beyond this point; rather, two investigators from the Personnel Security Division directed the investigation, which began in October 2003. ECF No. 128-4 at 5–6, ¶¶ 24–25; ECF No. 128-4 at 17, ¶ 50; ECF No. 128-5 at 4. On December 5, 2003, Commander Cooch placed Plaintiff Joy on administrative leave. ECF No. 128-4 at 17, ¶ 51; ECF No. 128-5 at 4, 16.

On February 2, 2004, the investigators issued a report that sustained the accusation that Plaintiff Joy had submitted false medical documents to support her claim of an on-duty injury. ECF No. 127-3 at 11, ¶¶ 52, 54; ECF No. 128-5 at 2–3, 11. On April 28, 2004, Commander Cooch provided Plaintiff Joy with notice of the proposed removal. ECF No. 128-4 at 11, ¶ 54; ECF No. 128-5 at 20–22. Chief Lindsey officially terminated Joy in August 2004. ECF No. 128-4 at 6, ¶ 25; ECF No. 128-5 at 27.

19

There is no evidence that Joy filed any claim with the EEOC about this termination. ECF No. 128-3 at 2, ¶ 6. However, the Fraternal Order of Police filed a grievance with the Federal Mediation and Conciliation Service challenging Plaintiff's removal. ECF No. 128-5 at 2–3. On July 24, 2005, the arbitrator reversed the BEP's decision to terminate Joy on procedural grounds, finding that the BEP had violated both her right to union representation during investigatory meetings pursuant to *Weingarten v. N.L.R.B.*, 420 U.S. 251 (1975), and 5 U.S.C. § 7114(a)(2)B), and a rule in the union contract governing her employment that required the BEP to complete personnel investigations within 45 days of receiving a complaint. ECF No. 128-5 at 10–15. Plaintiff Joy was reinstated at the BEP in January 2006. ECF No. 128-6 at 8–9. She alleges that Commander Cooch illegally terminated and reinstated seven other non-Caucasian officers, while no non-probationary Caucasian officer has been terminated in over 30 years, even if he or she committed significant infractions or crimes. ECF No. 150 at 10; ECF No. 150-1 at 56–57.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In order to establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson*, 477 U.S. at 249 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013)

21

(quoting *Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine dispute for trial." *Id.* Moreover, district courts approach summary judgment motions in employment discrimination or retaliatory action cases with "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014). Nonetheless, a plaintiff is still obligated to support his or her allegations by competent evidence. *Id.* Accordingly, a plaintiff may not avoid summary judgment through "conclusory allegations and speculation." *Id.*

## B.    Disparate Treatment and Retaliation

Under Title VII, it is unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," or retaliate against such individual for engaging in protected activities such as filing an EEO complaint alleging employment discrimination. 42 U.S.C. §§ 2000e–2, 2000e–3.

When, as here, a Title VII plaintiff does not offer direct evidence of discrimination, courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006). Under that framework, the plaintiff must initially establish a prima facie case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. The three essential elements of a Title VII disparate treatment claim are that the plaintiff (1) is a member of a protected class; (2) suffered adverse employment action; and (3) was treated differently from similarly-situated employees outside the protected class. *See, e.g.*, *Nichols v. Billington*, 402 F. Supp. 2d 48, 65 (D.D.C. 2005),

22

*aff'd*, No. 05-5326, 2006 WL 3018044 (D.C. Cir. Mar. 7, 2006); *see also Augustus v. Locke*, 934 F. Supp. 2d 220, 230 (D.D.C. 2013). Similarly, to establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered materially adverse employment action, and (3) a causal connection exists between the protected activity and the challenged retaliatory act. *Rochon v. Gonzales*, 438 F.3d 1211, 1219–20 (D.C. Cir. 2006). Once the plaintiff succeeds in making her prima facie showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the challenged action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the employer successfully does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext masking discrimination or retaliation. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

In a case alleging disparate treatment, an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). "An employee must 'experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" *Id.* (alteration in original) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). Instead, the challenged action must usually be accompanied by direct, negative economic consequences. *Douglas*, 559 F.3d at 553. As our Court of Appeals has explained, the threshold for adverse employment action in the retaliation context is slightly lower,

requiring harm that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," whether or not that harm was economic in nature. *Baird*, 662 F.3d at 1248 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

In employment discrimination cases, summary judgment usually focuses on whether the employer can articulate non-discriminatory reasons for its actions. Where an employer has done so, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Even in *Brady*, however, the D.C. Circuit implicitly recognized that the plaintiff must "suffe[r] an adverse employment action" before the reasons for that action, benign or discriminatory, can be evaluated. *Id.* Both the courts of this District and subsequent panels of the D.C. Circuit have recognized that proceeding to the *Brady* analysis may be premature when the defendant contests whether an adverse employment action occurred at all. *See, e.g., Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 146 (D.D.C. 2010).

If an adverse employment action occurred, the "one central question" on summary judgment then becomes whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" on the basis of a protected class or activity. *Brady*, 520 F.3d at 494. The Court of Appeals has clarified that in answering the central inquiry of *Brady*, a district court should consider "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be

available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (alteration in original) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1989) (*en banc*)); *cf. Brady*, 520 F.3d at 494 n.2 (noting that the question of whether a plaintiff was treated differently from a similarly situated employee who was not a member of the protected class is "relevant to the determination at summary judgment or trial whether intentional discrimination occurred").

To rebut her employer's stated reasons for its actions, a plaintiff may, among other things, come forward with comparative evidence that persons who are similarly situated to the plaintiff but are of a different race, sex, or age have been treated more favorably by the employer. *Brady*, 520 F.3d at 495. A plaintiff is similarly situated to another individual if "all of the relevant aspects of her employment situation [are] 'nearly identical' to those of the [comparator]." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995)). "If a reasonable juror would be unable to find that the plaintiff and the comparator were similarly situated, the court may decide, as a matter of law, that the two are not similarly situated." *Id.*; *see also Phillips v. Holladay Prop. Servs., Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996) ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects* . . . ." (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992))). To demonstrate that her employment situation is nearly identical to a comparator's, a plaintiff can show that the two had the same supervisors, background experience, and responsibilities. *See Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 97–98 (D.D.C. 2005).

A plaintiff may also carry her rebuttal burden with evidence demonstrating that "the employer is lying about the underlying facts that formed the predicate for the employment action,"

*Brady*, 520 F.3d at 495, or otherwise by "presenting enough evidence to allow a reasonable trier of fact to conclude that 'the employer's proffered explanation is unworthy of credence,'" *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (quoting *Burdine*, 450 U.S. at 256). But "if the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying[.]" *Brady*, 520 F.3d at 495.

Moreover, showing pretext requires more than simply criticizing the employer's decision-making process. "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Indeed, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Fischbach v. Dist. of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

### C.     Hostile Work Environment and Retaliatory Harassment

To succeed on a hostile work environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* "In addition, the plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive

connotations, but actually constituted discrimination because of' the employee's protected status." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). The D.C. Circuit also recognizes a cause of action for retaliatory harassment.[20] *See, e.g.*, *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) ("In this circuit, a hostile work environment can amount to retaliation under Title VII.").

A hostile work environment must be both objectively and subjectively hostile. *Harris*, 510 U.S. at 21. "This standard . . . takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* Generally, "isolated incidents," "offhand comments," and "simple teasing" "will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Title VII does not exist to remedy "the ordinary tribulations of the workplace." *Id.* (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)). Accordingly, personnel decisions, no matter how hostile, which are not linked to the plaintiff's protected class are not cognizable within a hostile-workplace claim. *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 80 (D.D.C. 2009); *Brewer v. Holder*, 20 F. Supp. 3d 4, 29 (D.D.C. 2013). "The standards for finding a workplace illegally hostile are sufficiently demanding"

---

[20] A claim for "retaliatory harassment" is also known as a "retaliatory hostile work environment" claim, and "[c]ourts in our circuit typically apply the same legal standard as that used in the discriminatory harassment context to determine whether retaliatory harassment is actionable." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79, 82–83 (D.D.C. 2013). However, at least one judge in this district has indicated that the standard for retaliatory harassment should more clearly mirror the standard for retaliation, such that a claim is actionable if the retaliatory harassment would deter a reasonable employee from engaging in protected activity. *See Burrell v. Shepard*, __ F. Supp. 3d __, __ n.2, 2018 WL 3614121, at *7 n.2 (D.D.C. 2018) (stating, "It is unclear whether the same standard applies to both discriminatory and retaliatory hostile work environment claims" and citing dicta from *Bergbauer*, which that case ultimately rejected, that there is an argument to be made that the standard for retaliatory harassment should be derived the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). In this case, as shown below in Sections III.B.2 and III.C.3, it is unnecessary to determine the proper standard, because Plaintiffs' claims would fail even under the lower standard.

27

precisely because courts must "ensure that Title VII does not become a 'general civility code.'" *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6 (D.D.C. 2012) (quoting *Oncale*, 523 U.S. at 80).

Actions challenged in this species of discrimination claim generally must be facially discriminatory—they cannot be facially neutral adverse actions motivated by discriminatory animus. *See Ware v. Hyatt Corp.*, 80 F. Supp. 3d 218, 232 (D.D.C. 2015) ("Plaintiff's reliance on facially-neutral conduct, without any evidence to link that conduct to his protected class, cannot save his . . . hostile work environment claim."). Thus, "[a] plaintiff cannot simply combine every allegation of mistreatment . . . into a single count and label it a hostile work environment claim. This is the 'kitchen sink' approach which is widely disapproved in this District." *Toomer*, 2016 WL 9344023, at *14 (citing *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 65 (D.D.C. 2012), and *Mason v. Geithner*, 811 F. Supp. 2d 128, 178 (D.D.C. 2011)). While acts comprising a hostile work environment need not be identical in kind or closely proximate in time, there should at least be a "common thread" connecting them. *Faison*, 896 F. Supp. 2d at 65. Indeed, the D.C. Circuit has noted that incidents can be considered "'part of the same actionable hostile environment claim' only if they are adequately linked into a coherent hostile environment claim—if, for example, they 'involve[] the same type of employment actions, occur[] relatively frequently, and [are] perpetrated by the same managers.'" *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120–21 (2002)).

## III. DISCUSSION

### A. Plaintiff Davis' Rule 56(d) Motion

As noted, Plaintiff Davis asks that the Court deny Defendant's motion for summary judgment pursuant to Rule 56(d) and allow further briefing in support of his request for an adverse evidentiary inference based on Defendant's alleged discovery failures. Rule 56(d) states:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 45(d). Whether to grant a Rule 56(d) motion is within the district court's discretion. *See, e.g.*, *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 25 (D.C. Cir. 2014).

The purpose of Rule 56(d) "is . . . to ensure that the non-moving party isn't 'railroaded' by a premature motion for summary judgment." *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 880 F. Supp. 2d 36, 41 (D.D.C. 2012), *aff'd*, 764 F.3d 19 (D.C. Cir. 2014). A party seeking relief under Rule 56(d) must submit a declaration stating with "sufficient particularity" why additional discovery is necessary. *Convertino v. U.S. Dept. of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (quoting *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1045 (D.C. Cir. 2008)). Specifically, a Rule 56(d) declaration must satisfy three criteria. *Id*. First, the declaration "must outline the particular facts [the movant] intends to discover and describe why those facts are necessary to the litigation." *Id*. Second, it "must explain 'why [the movant] could not produce [the facts] in opposition to the motion [for summary judgment].'" *Id*. at 99–100 (second and third alterations in original) (quoting *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999)). "Third, it must show the information is in fact discoverable." *Id*. at 100. "A district court should carefully scrutinize a Rule 56(d) affidavit to ensure that it meets the three *Convertino* criteria." *Jeffries v. Lynch*, 217 F. Supp. 3d 214, 227 (D.D.C. 2016), *motion for relief from judgment denied sub nom.*, *Jeffries v. Sessions*, 323 F.R.D. 437 (D.D.C. 2018). In sum, the affidavit of declaration "cannot be a generalized, speculative request to conduct discovery but must demonstrate that

29

further specified discovery will defeat a summary judgment motion."[21] *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 35 (D.D.C. 2010) (quoting *Maduforo v. Urban Serv. Sys. Corp.*, 2009 WL 2378743, at *1 (D.D.C. July 31, 2009); *see also Morales v. Humphrey*, 309 F.R.D. 44, 48 (D.D.C. 2015) ("Rule 56(d), moreover, may not be used to defeat a motion for summary judgment when there is 'mere speculation' of evidence not yet discovered." (quoting 11 Moore's Federal Practice, ¶ 56.102 (3d Ed.))).

In this case, while Plaintiff Davis' Rule 56(d) request meets the first *Convertino* criterion, it fails to meet the second and third. As to the first, the declaration of counsel filed in connection with the request asserts that Plaintiff Davis seeks "complete selection files" for the positions at issue for which he was not selected in order to determine his qualifications relative to the other candidates and test the selecting official's reasons for passing him over. ECF No. 149-3, ¶¶ 5–6. Similarly, he seeks information from Defendant's EEO files, including his complaints and counseling notes, in order to meet the defense that Plaintiff Davis did not exhaust his administrative remedies as to the claims at issue. *Id.*, ¶ 8. That appears to satisfy the bare minimum of the first *Convertino* prong, that the declaration "outline the particular facts [the 56(d) movant] intends to discover and describe why those facts are necessary to the litigation." 684 F.3d at 99; *cf. Richie v. Vilsack*, 287 F.R.D. 103, 106 (D.D.C. 2012) (affidavit met first *Convertino* prong where it asserted that declarant who criticized plaintiff's work had never before expressed concerns about plaintiff's performance, supporting request to depose declarant).

However, the declaration does not explain why Plaintiff Davis "could not produce [the facts] in opposition to the motion [for summary judgment].'" *Convertino*, 684 F.3d at 99

---

[21] Here, Plaintiff Davis does not seek further discovery, but rather asks for an adverse evidentiary inference pursuant to Rule 56(d)(3) regarding the discovery Defendant allegedly failed to provide. Nevertheless, neither *Convertino* nor cases following it indicate that there is a different standard depending on the relief sought under the rule.

(alterations in original) (quoting *Carpenter*, 174 F.3d at 237). In his opposition, Plaintiff Davis claims that he "did not have the opportunity in discovery to follow up on facts and evidence first identified in BEP's motion for summary judgment." ECF No. 149 at 4. The argument is specious. As outlined above, Defendant filed his motion for summary judgment on August 31, 2017. ECF No. 127. Two weeks later, this Court held a hearing on Davis's previously filed motion to compel. Minute Entry (Sept. 12, 2017). At that hearing the Court stated that if Plaintiff Davis felt it became necessary in light of Defendant's supplementary production he could request the opportunity to conduct additional depositions or discovery. Indeed, Plaintiff Davis explicitly reserved the right to do so. Defendant thereafter supplemented its responses to plaintiff Davis' document requests and interrogatories. ECF No. 144. After Defendant had produced the supplementary information, Plaintiff Davis twice requested, and was granted, extensions of the deadline for filing his opposition to the motion for summary judgment in order to review the documents. ECF No. 145; ECF No. 147. Yet he failed to ask for additional discovery or depositions. "If [Plaintiff Davis] truly needed discovery, [he] could have asked" for it. *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Castle Hill Health Care Providers, LLC*, 312 F.R.D. 678, 684 (D.D.C. 2015) (denying Rule 56(d) motion); *see also Butler v. Ashcroft*, 293 F. Supp. 2d 74, 78 (D.D.C. 2003) (noting that plaintiff's three extensions of time to respond to defendant's motion for summary judgment "gave her adequate time to conduct discovery" and denying Rule 56(d) motion). Moreover, it bears noting that the motion for summary judgment was pending for two and one-half months before the opposition was filed. It is clear that Plaintiff Davis failed to take advantage of this Court's offer to conduct additional discovery. *See Alexander v. FBI*, 186 F.R.D. 180, 185 (D.D.C. 1999) ("[A] request for relief under [the precursor to Rule 56(d)] is extremely unlikely to succeed when the party seeking the delay has failed to take advantage of discovery.").

31

There are further weaknesses in Plaintiff Davis' argument. For example, he contends that Defendant did not produce an organizational chart of the BEP Office of Security until the motion for summary judgment was filed and that, therefore, Plaintiff Davis "did not have the opportunity to conduct discovery on the reporting structure of the Texas [F]acility because [Defendant] did not identify facts concerning the facility as supportive of any defense or claim." ECF No. 149-1 at 2, ¶ 13 n.1. But the Amended Complaint in this action alleges that Plaintiffs were the victims of disparate treatment because policies at the D.C. Facility diverged from those at the Texas Facility. ECF No. 25, ¶¶ 14–19, 20–21, 23–24, 32–36, 40, 46–48, 50, 52, 63, 71. In order to succeed on that claim, Plaintiffs must show that "all relevant aspects" of their employment at the D.C. Facility were "nearly identical" to those at the Texas Facility. *Holbrook*, 196 F.3d at 261. And, "[t]he similarly-situated requirement is generally difficult to meet; the alleged comparator 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Toomer*, 2016 WL 9344023, at *28 (quoting *Phillips*, 937 F. Supp. at 37). Therefore, Plaintiff Davis cannot claim that he did not know that questions of the day-to-day control of employees at the two facilities would be significant. As the D.C. Circuit has held, Rule 56(d) "is not properly invoked to relieve counsel's lack of diligence." *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995).

Finally, Davis has failed to satisfy the third prong of *Convertino* by showing that the information he seeks can in fact be obtained through additional discovery. 684 F.3d at 100. The problem is one of imprecision and, perhaps, a lack of familiarity with the record. Plaintiff Davis' counsel's affidavit has outlined, in general, the facts he seeks to discover, such as information about the four job vacancies at issue and about his EEO complaints. ECF No. 149-3, ¶¶ 5–6, 8.

However, he fails to show that the specific information is discoverable. For example, he asserts that he received ratings sheets from the Sergeants Board for only one of the four vacancies, and that Defendant "contends that such a Board was convened and that candidates were so rated" for others, without identifying which others he means. *Id.*, ¶ 5. But Defendant's statement of undisputed facts explicitly mentions a Sergeants Board in connection with only the 2004 Vacancy. ECF No. 127-1, ¶¶ 94–97. That same document indicates that there was no Sergeants Board for vacancy 2003-007-AJC, because Commander Cooch interviewed the candidates himself. ECF No. 127-1, ¶¶ 71–72. That is confirmed by the August 2007 FLRA decision on various claims made by Plaintiff Davis of unfair labor practices. ECF No. 127-5 at 15. That same document states that a Sergeants Board was not used in connection with the 2005 Vacancy. *Id.* at 15–16. To the extent that documents do not exist, they are not discoverable. *See, e.g., Wagener v. SBC Pension Benefit Plan—Non-Bargained Program*, No. 1:03 CV 00769 RCL, 2007 WL 915209, at *4 (D.D.C. Mar. 26, 2007); *see also, e.g., Machinery Solutions, Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522, 537 (D.S.C. 2018); *Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, No. 99 Civ. 1330, 2000 WL 521341, at *3 (S.D.N.Y. May 1, 2000) ("[T]he Court cannot compel production of what does not exist."). Plus, the record contains documents including numerical ratings of candidates (whether from a Sergeants Board or not) for the 2002, 2004, and 2005 vacancies. Plaintiff does not explain why any other ratings sheets, should they exist, would not be duplicative of the evidence already produced. Duplicative evidence is not discoverable. *See, e.g., Serv. Emps. Int'l Union Nat'l Indus. Pension Fund*, 312 F.R.D. at 685 ("[H]aving failed to explain what discovery they seek to obtain from Plaintiffs that is not duplicative of records already in their possession, Defendants have failed to satisfy the third *Convertino* factor.").

As to information allegedly held by Defendant regarding Plaintiff Davis' EEO complaints, Defendant has filed a declaration from the Deputy Chief of the Office of Equal Opportunity and Diversity Management at the BEP, who reviewed the office's files and found no evidence that Plaintiff Davis filed EEO claims about these non-selections, which are the bulk of the claims for which Defendant argues Plaintiff Davis did not exhaust his administrative remedies. ECF No. 127-2 at 21–24; ECF No. 127-4 at 1–2, ¶¶ 1–5. Plaintiff Davis has not, therefore, established that any such documents exist, much less that they are discoverable at this time.. *See, e.g.*, *Wagener*, 2007 WL 915209, at *4.

Because Plaintiff Davis has failed to satisfy the *Convertino* standard, his Rule 56(d) motion should be denied.

**B.      Motion for Summary Judgment Against Plaintiff Davis**

As Judge Richard W. Roberts noted in his opinion on Defendant's motion to dismiss (before the case was reassigned to Judge Ketanji Brown Jackson in April 2013), Plaintiffs' filings suffer from "frequent imprecision and vexingly loose factual organization." *Davis*, 919 F. Supp. 2d at 14 n.5. As may be gleaned from the outline above, the Amended Complaint merely listed a number of incidents and policies, claiming that they are discriminatory, retaliatory, or harassing— or all three—but did not clearly identify which allegations apply to which plaintiff or to which cause of action. It is therefore no straightforward task to determine what evidence each of the remaining two plaintiffs asserts supports which of his or her remaining claims.

Defendant's motions for summary judgment have met this challenge by arguing that he is entitled to summary judgment on all of Plaintiffs' claims by addressing each allegation in the Amended Complaint that could plausibly pertain to either remaining Plaintiff. In response, Plaintiff Davis' opposition, which is troublesomely vague, concentrates on a few specific

34

incidents. He contends that Commander Cooch's emails of September 17, 2004, and June 2, 2006, as well as his comment regarding the "banana" in his holster, displayed discriminatory and retaliatory animus. ECF No. 149 at 6–7, 9. He further asserts that the following incidents are evidence of harassment and retaliation: the denial of his application to serve as a tactical instructor in 2004; the refusal to pay him earned overtime on September 2004; the refusal to pay him night differential pay in October 2004, and the subsequent charge that he was absent without leave for sixteen hours; the imposition of "unwarranted discipline"; and the failures to promote him. *Id.* at 7–9. These facts assertedly support not only Plaintiff Davis' disparate treatment claim, but also his harassment, retaliation, hostile work environment, and retaliatory harassment claims. *Id.* at 8–13.

In addressing this motion for summary judgment, the undersigned has used Plaintiff Davis' opposition as a guide. This report and recommendation therefore focusses primarily on the incidents that Plaintiff Davis cites as support for his claims, although it will be clear from the discussion below that the undersigned has considered allegations and incidents not specifically identified by Plaintiff Davis in his opposition.[22]

---

[22] Approaching the imprecise and loosely organized claims in this manner is sound in practice. *See, e.g., Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 78 & n.12 (D.D.C. 2009) (tailoring analysis of defendant's dispositive motion to the arguments and facts presented in plaintiff's opposition, and noting that "without such tailoring, the Court would be left to guess" as to which allegations supported which claims); *see also Walker v. District of Columbia*, 279 F. Supp. 3d 246, 260–61 (D.D.C. 2017) ("[T]he Court will review Plaintiff's claim for discrimination as set forth in her Opposition."). It is also legally sound, notwithstanding the D.C. Circuit's recent decision in *Winston & Strawn, LLP v. McLean*, 843 F.3d 503 (D.C. Cir. 2016). In that case, the D.C. Circuit held that, where a non-movant fails to respond to a motion for summary judgment, the district court cannot merely treat the motion as conceded. Rather, the court "must determine for itself that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, and then 'should state on the record the reasons for granting or denying the motion.'" *Id.* at 509 (quoting Fed. R. Civ. P. 56(a)). However, it is far from clear that *Winston & Strawn* applies in a situation in which the non-movant has filed submissions responsive to a motion for summary judgment. As Judge Amy Berman Jackson has explained:

> [*Winston & Strawn*] arose in the context of a case in which the district court exercised its discretion under the Local Rules to treat a summary judgment motion as conceded when the non-moving party failed to file any opposition at all. . . .

35

1.      Disparate Treatment and Retaliation Claims

        a.      *Exhaustion*

Before an individual can bring a claim in district court pursuant to Title VII, he must exhaust his administrative remedies. *See, e.g.*, *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010); *see also, e.g.*, *Koch v. Walter*, 934 F. Supp. 2d 261, 267 (D.D.C. 2013). "Whether a plaintiff in a Title VII case has timely exhausted administrative remedies is not a jurisdictional requirement, but is an affirmative defense that the defendant bears the burden of proving by a preponderance of the evidence." *Tapp v. Washington Metro. Area Transit Auth.*, 283 F. Supp. 3d 1, 5 (D.D.C. 2017); *see also Briscoe v. Costco Wholesale Corp.*, 61 F. Supp. 3d 78, 84–85 (D.D.C. 2014) ("In raising

---

But that is not what happened in this case. Defendant met its initial responsibility to inform the Court of the basis of its motion, and it pointed to the portions of the record that demonstrate the lack of any genuine issue of material fact. And here, unlike in *Winston & Strawn*, plaintiffs filed a timely opposition to the motion for summary judgment. Thus, plaintiffs have availed themselves of the opportunity provided in Rule 56(c) to address all of defendant's assertions of fact, and, pursuant to Rule 56(e), the Court may consider facts "undisputed for purposes of the motion" when "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . ." Fed. R. Civ. P. 56. Since plaintiffs have not presented facts that would give rise to a genuine dispute of material fact concerning [certain bases on which the defendant moved for summary judgment], there is no dispute for the Court to adjudicate, and the requirements of Rule 56 have been satisfied.

*Dutton v. U.S. Dep't of Justice*, 302 F. Supp. 3d 109, 126 n.6 (D.D.C. 2018) (ellipses in original); *see also Rojas-Vega v. U.S. Immigration and Customs Enforcement*, 302 F. Supp. 3d 300, 308–09 (D.D.C. 2018) (same). Moreover, *Winston & Strawn* did not purport to invalidate the well-established principle that "when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded," which has been applied both before and after the issuance of *Winston & Strawn. See, e.g., Menoken v. Lipnic*, 300 F. Supp. 3d 175, 185–86 (D.D.C. 2018), *reconsideration denied*, No. CV 16-2480 (RMC), 2018 WL 3474465 (D.D.C. July 19, 2018) (quoting *Hopkins v. Women's Div.*, 284 F.Supp.2d 15, 25 (D.D.C. 2003)); *Walker*, 279 F. Supp. 3d at 260 (D.D.C. 2017); *Johnson v. District of Columbia*, 49 F. Supp. 3d 115, 121–22 (D.D.C. 2014) (same).

Here, Defendant quite clearly moved for summary judgment on all of Plaintiff Davis' claims: disparate treatment, retaliation, hostile work environment, and retaliatory harassment. Plaintiff Davis opposed that motion, addressing each of those claims and pointing to facts that he contends create a genuine issue for trial. Plaintiff Davis cannot defeat Defendant's comprehensive motion merely by relying on facts pleaded in the Amended Complaint. *See, e.g.. Nessar v. District of Columbia*, 962 F. Supp. 2d 234, 242 ("[A]llegations    . . . are . . . insufficient to defeat summary judgment, as Plaintiff must substantiate such allegations with actual facts."); *see also Savage v. Scales*, 310 F. Supp. 2d 122, 132 (D.D.C. 2004).

exhaustion as an affirmative defense, the defendant 'bears the burden of proving by a preponderance of the evidence that the plaintiff has failed to exhaust his administrative remedies.'" (quoting *Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 276 (D.D.C. 2011))); *Mount v. Johnson*, 36 F. Supp. 3d 74, 80 (D.D.C. 2014) (Jackson, Ketanji, J.) (same). Where a defendant has presented evidence that a claim was not exhausted, such as a declaration by a person with personal knowledge that the relevant files do not contain records of a grievance or complaint, vague assertions without supporting details that the plaintiff exhausted a claim will not create genuine issue of fact. *See, e.g.*, *Carter-Frost v. District of Columbia*, 305 F. Supp. 3d 60, 74 (D.D.C. 2018) (assertions that plaintiff "regularly complained" about allegedly discriminatory treatment do not create genuine issue of fact where defendant submitted affidavit stating that EEO office had no record of such complaints); *Francis v. District of Columbia*, 731 F. Supp. 2d 56, 67 (D.D.C. 2010) (a party cannot rely on speculation or conclusory statements to defeat a motion for summary judgment).

In the case of federal employees covered by a collective bargaining agreement (as were Plaintiffs here), the exhaustion regime is more complex. Regulations promulgated pursuant to Title VII outline a procedure setting time limits for initial contact with an EEO counselor and, if the matter is not resolved informally, for the filing of an official complaint with the agency, which then must culminate in a final decision of the EEOC. *See, e.g.*, *Horsey v. U.S. Dep't of State*, 170 F. Supp. 3d 256, 264 (D.D.C. 2016) (Ketanji Jackson, J.). A federal employee who is covered by a collective bargaining agreement may have another avenue to exhaust Title VII claims. If the collective bargaining agreement "permits allegations of discrimination to be raised in a negotiated grievance procedure," 29 C.F.R. § 1614.301(a), then the employee may choose to exhaust his claims through that grievance procedure, *see, e.g.*, *Carter v. Carson*, 241 F. Supp. 3d 191, 197–98

37

(D.D.C. 2017); *Koch*, 934 F. Supp. 2d at 268, which begins with a complaint and proceeds to an arbitrator's decision. A claimant who chooses the negotiated procedure may appeal the arbitrator's award to the FLRA by filing an "exception." 5 C.F.R. §§ 2420.1(h), 2425.2(a). The FLRA then "shall issue its decision and order taking such action and making such recommendations concerning the award as it considers necessary, consistent with applicable laws, rules, or regulations." 5 C.F.R. § 2425.10. If an employee receives an adverse decision from the FLRA, he may appeal that decision to the EEOC. 5 C.F.R. § 7121(d) ("An aggrieved employee affected by a prohibited personnel practice under section 2302(b)(1) of this title [prohibiting discriminatory practices under Title VII, the ADEA, the Fair Labor Standards Act, the Rehabilitation Act, and 'on the basis of marital status or political affiliation'] which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure . . . . Selection of the negotiated procedure in no manner prejudices the right of an aggrieved employee . . . to request the Equal Employment Opportunity Commission to review a final decision in any other matter involving a complaint of discrimination of the type prohibited by any law administered by the Equal Employment Opportunity Commission."); 29 C.F.R. § 1614.401(d) ("A grievant may appeal a final decision of the agency, the arbitrator or the Federal Labor Relations Authority (FLRA) on the grievance when an issue of employment discrimination was raised in a negotiated grievance procedure that permits such issues to be raised [subject to certain exceptions not relevant here]."). Indeed, in order to later file a claim under Title VII, the grievant must do so: "[t]he employee who chooses the negotiated procedure may appeal the [final] decision to the EEOC. Only after the EEOC has rendered a decision or failed to do so within 180 days may the employee use section 2000e–16(c) and initiate suit in district court." *Johnson v. Peterson*, 996 F.2d 397, 401 (D.C. Cir. 1993); *see also Fernandez v. Chertoff*, 471 F.3d 45, 54 (2d

38

Cir. 2006) (same, citing *Johnson*); *Koch*, 934 F. Supp. 2d at 269 ("An employee who pursues his claims under the negotiated grievance procedure . . . may reach federal court only after appealing the final decision in the grievance process to the EEOC.").[23] .

Here, neither party argues that the negotiated grievance procedure that governs the police officers at the D.C. Facility excluded claims of discrimination and, indeed, it appears that Plaintiff Davis filed at least one such grievance. ECF No. 149-17. Thus, Plaintiff Davis had two potential ways to exhaust his Title VII discrimination claims. But he had to make a choice, because a claimant must elect one route to exhaustion or the other, and pursue the chosen route to its conclusion before filing a discrimination complaint under Title VII. Put another way, "a person wishing to file a complaint or a grievance on a matter of alleged employment discrimination must elect to raise the matter under either part 1614," which comprise the regulations governing the EEO process, "or the negotiated grievance procedure, but not both." 29 C.F.R. § 1614.301(a); *see also* 5 U.S.C. § 7121(d) ("An aggrieved employee affected by a prohibited personnel practice . . . which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both."); *Vinieratos v. U.S. Dep't of the Air Force ex rel. Aldridge*, 939 F.2d 762, 775 (9th Cir. 1991) ("The law . . . requires that claimants in such disputes exhaust whichever of these alternative administrative remedies they

---

[23] Defendant appears to argue that, if an employee covered by a collective bargaining agreement chooses to use the grievance procedure, he is forever barred from bringing a claim of discrimination in federal court: "Given that Davis chose to seek redress through union grievances, the regulations preclude him from bringing a claim under Title VII in federal court." ECF No. 127-2 at 21. That position ignores federal regulations, *see* 5 C.F.R. § 7121(d); 29 C.F.R. § 1614.401(d), binding precedent from the D.C. Circuit, *see Johnson v. Peterson,* 996 F.2d 397, 401 (D.C. Cir. 1993), and the teaching of the Supreme Court in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59–60 (1974) ("We think, therefore, that the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII."), all of which make clear that an adverse decision on a complaint of discrimination under the negotiated grievance procedure may be appealed to the EEOC and thereafter the allegedly discriminatory action may be the subject of a Title VII complaint in federal court.

may properly elect to pursue."). "An employee is deemed to have made his selection upon either filing an administrative complaint or a grievance, and that election is irrevocable." *Koch*, 934 F. Supp. 2d at 268. That election pertains to the "matter" raised in the administrative complaint or grievance, which has been interpreted "to encompass more than a legal claim and instead to encompass the 'underlying action' or the 'topics' raised." *Guerra v. Cuomo*, 176 F.3d 547, 550 (D.C. Cir. 1999) (first quoting *Bonner v. Merit Systems Protection Bd.*, 781 F.2d 202, 204–05 (Fed. Cir. 1986), then quoting *Facha v. Cisneros*, 914 F. Supp. 1142, 1149 (E.D. Pa. 1996)); *see also Smith v. Jackson*, 539 F. Supp. 2d 116, 131 (D.D.C. 2008) (noting that claims "relate[d] to the same factual matter" are subject to the election, even if there is "a change in legal theories"); 29 C.F.R. § 1614.301(a) ("An aggrieved employee who files a grievance with an agency whose negotiated agreement permits the acceptance of grievances which allege discrimination may not thereafter file a complaint on the same matter under this part 1614," which, again, is the part governing the EEO process, "irrespective of whether the agency has informed the individual of the need to elect or of whether the grievance has raised an issue of discrimination."). Thus, if a claimant first brings an incident to the attention of an EEO counselor, he must exhaust through that process rather than through the grievance process, and vice-versa.

In short, to exhaust a claim of discrimination, an employee

may choose between the negotiated grievance procedure and the EEOC process unless the negotiated grievance procedure excludes discrimination complaints. The employee elects the EEOC process by contacting the agency EEO counselor; filing a written grievance constitutes election of the negotiated grievance procedure. The election is binding.

An employee who elects the negotiated grievance procedure follows the grievance procedure through all the steps up to arbitration. If the union refuses to invoke arbitration, the grievant may appeal the agency decision to the EEOC, which will review the administrative record as it would review any final agency decision. The grievant may bring a civil action in federal district court within ninety days of receiving the EEOC's final decision on appeal.

40

The grievant may appeal an arbitration decision to the EEOC. The union and the agency may file exceptions with the FLRA. The FLRA decision binds the agency, but the grievant may appeal that decision to the EEOC.

Maj. John P. Stimson, *Unscrambling Federal Merit Protection*, 150 Mil. L. Rev. 165, 202 (1995), *cited in Maddox v. Runyon*, 139 F.3d 1017, 1021 n.6 (5th Cir. 1998).

As noted, exhaustion of administrative remedies, although mandatory, is not a jurisdictional requirement; rather, failure to exhaust is an affirmative defense that Defendant has the burden to prove by a preponderance of the evidence. *See, e.g.*, *Tapp*, 283 F. Supp. 3d at 5; *Briscoe*, 61 F. Supp. 3d at 84–85 *Mount*, 36 F. Supp. 3d at 80. Where a defendant has presented evidence that a claim was not exhausted, such as a declaration by a person with personal knowledge that the relevant files do not contain records of a grievance or complaint, a plaintiff's vague assertions without supporting details that she exhausted a claim will not create a genuine issue of fact. *See, e.g.*, *Carter-Frost*, 305 F. Supp. 3d at 74 (vague assertions that plaintiff "regularly complained" about allegedly discriminatory treatment does not create genuine issue of fact on exhaustion where defendant submitted affidavit stating that EEO office had no record of such complaints); *Francis v. District of Columbia*, 731 F. Supp. 2d 56, 67 (D.D.C. 2010) (a party cannot rely on speculation or conclusory statements to defeat a motion for summary judgment).

Here, Defendant contends that Plaintiff Davis failed to exhaust his administrative remedies as to five claims: the claim that in September 2004, he was denied overtime pay for representing a fellow officer in connection with an EEO complaint, and his four non-selection claims.[24] As to the denial of overtime pay in September 2004, Defendant points to Plaintiff Davis' admission

---

[24] In his reply memorandum, Defendant asserts that Plaintiff Davis did not exhaust administrative remedies for his hostile work environment and retaliatory harassment claims. ECF No. 157 at 2. Arguments raised for the first time in reply are forfeit. *See, e.g.*, *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 313 n.51 (D.D.C. 2016).

during his deposition that he did not file an EEO complaint regarding that incident. ECF No. 127-2 at 8; ECF No. 127-8 at 37–38. Plaintiff Davis disagrees and cites a single page of a complaint dated October 22, 2004, to the Office of Equal Opportunity Bureau Resolution Center, as well as a single page of a decision from the EEOC. ECF No. 149-1 at 4, ¶ 57; ECF No. 149-7. However, the excerpts do not support Plaintiff Davis' assertion that "he filed a complaint which reasonably encompasses the denial of overtime." ECF No. 149-1 at 4, ¶ 57. Indeed, neither mentions a denial of overtime, at all. More disturbingly, when the entire EEOC decision is reviewed (Defendant attached it as an exhibit to his reply), it is clear that the only claim raised in that EEO complaint was related to Commander Cooch's September 17, 2004 email. Defendant has therefore shown, by a preponderance of the evidence, that this claim was not the subject of an EEO complaint.

But Defendant has presented no evidence that Plaintiff Davis failed to utilize the negotiated grievance procedure. The declaration submitted to the Court from Marla Gissentanna, an Employee and Labor Relations Specialist at the BEP who maintains grievance files of BEP employees, does not address whether a grievance was filed as to this incident. ECF No. 127-4 at 4–5. Nor does the declaration from Willie Tucker, the Deputy Chief of the Office of Equal Opportunity and Diversity Management at the BEP, affirm that he searched for records of a claim filed with the EEOC (which would be the final step before filing a complaint in district court) as to the matter. *Id.* at 1–3. Thus, Defendant has not met his burden to show non-exhaustion on this claim.

Defendant has a similar problem with Plaintiff Davis' claims as to his four non-selections. Defendant has produced evidence in the form of a declaration from Mr. Tucker that Plaintiff Davis did not file a timely EEO complaint regarding his non-selection for any of the vacancies. ECF No. 127-4 at 2, ¶ 4 (2003 Vacancy, 2004 Vacancy, 2005 Vacancy), ¶ 5 (2002 Vacancy). Plaintiff

42

Davis' only argument in response is that he made EEO complaints about many incidents of alleged discrimination or retaliation, but that he cannot recall precisely which ones. ECF No. 149-2, ¶¶ 6–7. As noted above, that is not sufficient to create an issue for trial on the question of exhaustion. *See Carter-Frost*, 305 F. Supp. 3d at 74. Defendant has therefore established that these claims were not exhausted through the EEO procedure.

But Defendant has again not shown that Plaintiff Davis did not utilize the negotiated grievance procedure. The declaration of Ms. Gissentanna does not assert that she searched for records of grievances filed as to any of those vacancies, arbitrations of any such grievances, or appeals of arbitration awards as to any of those vacancies. ECF No. 127-4 at 4–5. Nor does the declaration of Mr. Tucker indicate that he searched for appeals to the EEOC in connection with any of those non-selections. *Id.*, at 1–3.

Instead, Defendant (and Ms. Gissentanna's declaration) focusses on evidence of the two charges that Plaintiff Davis filed with the Regional Director of the Washington Regional Office of the FLRA. Those are a "Charge Against an Agency" dated May 21, 2004, that mentions Plaintiff Davis' non-selections in connection with the 2002, 2003, and 2004 Vacancies—asserting that he was not selected "as a result of [his] union activities"—and specifically seeks relief from the FLRA for management's alleged failure to provide him information needed to prepare for the application process (ECF No. 127-7 at 12, 14–15); and a decision dated August 1, 2007, from the Regional Director on another "unfair labor practice charge" in which Plaintiff Davis objected to the BEP "[n]ot promoting [him] to the position of Sergeant under Certification 2005-043-RYM [the 2005 Vacancy] in April 2005, and several other Certifications between 1998 and 2004, because he

43

engaged in protected activity" (ECF No. 127-5 at 13). The Regional Director declined to issue a complaint on either charge.[25] ECF No. 127-5 at 20; 127-6 at 6.

Defendant's somewhat complicated argument that these unfair labor practice charges establish that Plaintiff Davis failed to exhaust his administrative remedies as to these non-selections is premised on the notion that the two charges filed with the Regional Director are themselves (or perhaps are evidence of) grievances utilizing the negotiated grievance process under the collective bargaining agreement. ECF No. 127-2 at 20–21. If that were correct, then the filing of the charges would have been an irrevocable election to use the negotiated grievance procedure, *see, e.g.*, *Koch*, 934 F. Supp. 2d at 268, and the failure to appeal those charges through the grievance process to a final decision and an EEOC appeal would be a failure to exhaust. But the premise is mistaken. As Defendant recognizes elsewhere in his opening brief, Plaintiff Davis' two charges were filed with the Regional Director pursuant to 5 U.S.C. § 7118, which allows a person to charge an agency with engaging in an unfair labor practice such as conduct "discourag[ing] membership in any labor organization by discrimination in connection with . . . promotion," and "discriminat[ing] against an employee because the employee has filed a complaint, affidavit, or petition" in connection with an unfair labor practice. 5 U.S.C. §§ 7116(a)(2), (4), 7118(a)(1). Indeed, in making its argument, Defendant cites the regulations that govern an unfair labor practice charge. ECF No. 127-2 at 18–20 (citing 5 C.F.R. §§ 2423.6(a), 2423.8(a), 2423.11(a), (c)–(e)).

But a "charge" claiming an unfair labor practice is different from an "exception" to an arbitrator's award pursuant to the negotiated grievance procedure. *See, e.g.*, *Tucker v. Def. Mapping Agency Hydrographic/Topographic Ctr.*, 607 F. Supp. 1232, 1238–39 (D.R.I. 1985)

---

[25] Plaintiff Davis filed an untimely appeal of the Regional Director's decision not to issue a compliant on the later charge (ECF No. 127-6 at 10–11), but there is no evidence in the record of any resolution of that appeal.

44

(distinguishing between an unfair labor practice "charge" and an "exception" to an arbitrator's award). This is more than a semantic distinction; the process governing a challenge to an unfair labor practice is not the process used to appeal an adverse decision from an arbitrator after utilization of the negotiated grievance procedure. The statutory provision governing exceptions to arbitrator's awards is not 5 U.S.C. § 7118, but rather 5 U.S.C. § 7122, which is in a different subchapter of the statute, and the regulations governing an exception to an arbitrator's award are not the same as those governing a charge of an unfair labor practice. *See* 5 U.S.C. § 2420.1(g), (h); *compare* 5 C.F.R. § 2423.0 (stating that section applies to unfair labor practice cases), *with* 5 C.F.R. § 2425.1 (stating that section applies to "arbitration cases in which exceptions are filed with the Authority").[26] And Defendant does not argue that Plaintiff Davis' racial discrimination and retaliation claims—except to the extent that any retaliation was based on union activity—could be brought in connection with an unfair labor practice charge under section 7118, rather than through the negotiated grievance procedure or the EEO process. *See* 29 C.F.R. § 1614.301(a) ("[A] person wishing to file a complaint or a grievance on a matter of alleged employment discrimination must elect to raise the matter under either [the regulations governing the EEO process] or the negotiated grievance procedure, but not both."). Indeed, discrimination based on race or retaliation for

---

[26] The current versions of these regulations apply to charges filed after July 25, 2012, or exceptions filed after June 4, 2012. However, the distinction between charges of an unfair labor practice under 5 C.F.R. Part 2423 and exceptions to an arbitrator's award under Part 2425 was in effect at the time that Plaintiff Davis filed his charges with the Regional Director. *See* Unfair Labor Practice Proceedings, 63 Fed. Reg. 65638-01 (Nov. 30, 1998) (codified at 5 C.F.R. § 2423.0) ("This newly-created section incorporates and amends §2423.1 of the current regulations. Specifically, this section is amended to clarify that Subpart A of the regulations is applicable to any charge pending or filed after January 1, 1999. The provision regarding applicability of this part to any complaint filed on or after October 1, 1997 remains unchanged."); Federal Labor Relations Authority; General Counsel of the Federal Labor Relations Authority, and Federal Service Impasses Panel, 45 Fed. Reg. 3497, 3513 (Jan. 17, 1980) (codified at 5 C.F.R. 2420.1(g), (h) and 2425.1(a) (noting that regulations apply to the resolution of "complaints of unfair labor practices under 5 U.S.C. § 7118" and resolution of "exceptions to arbitrator's awards under 5 U.S.C. § 7122," and stating, "Either party to arbitration under chapter 71 of title 5 of the United States Code may file an exception to an arbitrator's award rendered pursuant to the arbitration").

protected conduct not connected with union activity is not an unfair labor practice actionable under 5 U.S.C. § 7118. *See* 5 U.S.C. §§ 7116, 7118.

So, Plaintiff Davis' unfair labor practice charges do not indicate that he chose the negotiated grievance procedure over the EEO process, and any failure to complete the process under 5 U.S.C. § 7118 does not establish a failure to exhaust with respect to the discrimination and retaliation claims he brings here.[27] Rather, Defendant would have to establish non-exhaustion by other means, such as through declarations from employees who have searched the files for both grievances and EEOC appeals related to Plaintiff Davis' four non-selections and found none. *See, e.g., Carter-Frost*, 305 F. Supp. 3d at 74. But, as discussed above, the declarations from Mr. Tucker and Ms. Gissentanna are deficient: Mr. Tucker searched files for EEO complaints (and found none) but Ms. Gissentanna focused on unfair labor practice charges, which are not relevant here because they are not part of the negotiated grievance procedure. Therefore, at this point, Defendant has not met his burden to show that these claims are unexhausted. *See, e.g., Mount*, 36 F. Supp. 3d at 80 (Defendant must show non-exhaustion by a preponderance of the evidence).

b. *Materially Adverse Consequences*

As noted above, a prima facie case of disparate treatment requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Baird*, 662 F.3d at 1248. In the case of retaliation, the plaintiff must show harm that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* A number of

---

[27] Defendant accurately notes (ECF No. 127-2 at 18–20) that the failure to issue a complaint by the Regional Director or by the FLRA's General Counsel as to an alleged unfair labor practice is not subject to judicial review. *See, e.g., Turgeon v. Fed. Labor Relations Auth.*, 677 F.2d 937, 938, 940 (D.C. Cir. 1982) (per curiam). However, that fact is immaterial to the discussion here.

Plaintiff Davis' claims must fail because he has not shown that he suffered any materially adverse consequences from the alleged discriminatory conduct.

Among these claims are a number that Plaintiff Davis admitted his deposition, and does not now dispute in his summary judgment papers, do not pertain to him. That is, the following claims can be rejected because Plaintiff Davis has admitted that he suffered no adverse consequences from them:

(1) denying CCN numbers to officers in the Communication Police Operations Center, as Plaintiff Davis admitted that he did not work in the Communications Police Operations Center during the relevant period ECF No. 25, ¶ 23; ECF No. 127-8 at 7–9;

(2) the promotion ceremony for Caucasian officers, as Plaintiff Davis agreed to strike this allegation, as it did not pertain to him.. ECF No. 25, ¶ 45; ECF No. 127-8 at 44;

(3) denying officers access to certain sections within the BEP, as Plaintiff Davis admitted that the allegation did not apply to him. ECF No. 25, ¶¶ 23, 46; ECF No. 127-8 at 23.

(4) prohibiting officers at the D.C. Facility from investigating, apprehending, detaining, or transporting arrested criminals, as Plaintiff Davis admitted that this allegation did not relate to him. ECF No. 25, ¶ 48; ECF No. 127-8 at 24; and

(5) threatening discipline if an officer observed an incident and failed to act, as Plaintiff Davis agreed to strike this allegation as unrelated to him. ECF No. 25, ¶ 52; ECF No. 127-8 at 25.

Indeed, as Defendant indicates in his motion for summary judgment, the evidence that Plaintiff Davis suffered *any* materially adverse consequences sufficient to meet his *prima facie* case for either a disparate treatment or a retaliation claim is thin to the point of vanishing. Other than his claims relating to the four non-selections, Plaintiff Davis points to only a few incidents— tellingly identified as "microagressions" (ECF No. 149 at 7)—that could be interpreted to have had any material effect, at all. He mentions "unwarranted discipline; denying work[-]enhancing

opportunities such as serving as a tactical training instruct[or]; denying overtime; and taking away his pay by charging him as AWOL." ECF No. 149 at 9.

As to unwarranted discipline, Plaintiff Davis provides little detail as to the parameters of the discipline imposed. For example, he asserts that he was "disciplined" and "reprimanded" after an incident when a supervisor "threw some clothing in [his] face," that he received a "letter of reprimand" when he failed to remove an "impact weapon" from a police car, and that he was reprimanded for failure to do a "key inventory." ECF No. 149-18 at 2–6. Plaintiff Davis further testified that "[a]ll [his] disciplines were rescinded." *Id.* at 11. Formal reprimands, including letters of reprimand, have been held not to be actionable adverse employment actions, even in the context of an action claiming retaliation. *See, e.g.*, *Toomer*, 2016 WL 9344023, at *25 ("[N]either [a] performance review nor [a] letter of reprimand constitutes an adverse action even under the lower standard applicable to retaliation claims."). That is especially true if they are rescinded. *See Wade v. District of Columbia*, 780 F. Supp. 2d 1, 17 (D.D.C. 2011) (noting, in addressing summary judgment motion on retaliation claim, that "a reprimand is generally not actionable as retaliation unless there is some evidence that it caused material harm to the employee. . . . The fact that the reprimand was rescinded generally precludes a claim that the reprimand was materially adverse"); *Na'im v. Clinton*, 626 F. Supp. 2d 63, 77–78 (D.D.C. 2009) (rescinded reprimands not "'materially adverse' actions even under the broader definition applicable in connection with retaliation claims"); *see also, e.g.*, *Walker v. Wash. Metro. Area Transit Auth.*, 102 F. Supp. 2d 24, 29 (D.D.C. 2000) (collecting cases in disparate treatment context).

Similarly, Plaintiff Davis fails to provide sufficient detail to allow a reasonable fact-finder to conclude that the denial of the "work-enhancing" opportunity to serve as a tactical training instructor was materially adverse. Indeed, courts have found that similar bare-bones claims, such

48

as claims that a plaintiff was denied specialized training, do not constitute cognizable adverse actions in either the disparate treatment or retaliation contexts. *See, e.g.*, *Walker v. Mattis*, __ F. Supp. 3d __, __, 2018 WL 3637462, at *5 (D.D.C. 2018) (finding denial of training opportunity did not constitute retaliatory adverse action where plaintiff provided no evidence that it affected conditions of employment); *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 150 (D.D.C. 2010) (hypothesizing that "there could well be fact patterns in which denial of . . . specialized . . . training would be materially adverse and could dissuade an employee from further protected conduct," but granting summary judgment to defendant where plaintiff presented no evidence to show that such denial imposed materially adverse consequences).

The same is true of Plaintiff Davis' overtime pay claims. In both the disparate treatment and retaliation contexts, courts have held that temporary and minimal reductions in pay or responsibility do not constitute material adversity. *See, e.g.*, *Arafi v. Mandarin Oriental*, 867 F. Supp. 2d 66, 72–73, 75 (D.D.C. 2012). Here, Plaintiff Davis has pointed to evidence from his 2009 affidavit in this action that he was denied authorization to work seven and one-half hours of overtime during the month of July 2004, that he was denied an unspecified amount of overtime for work performed on a date in September 2004, and that in October 2004, he was denied an unspecified amount of night differential pay. ECF No. 33 at 14–15, ¶¶ 3–4, 6. He has since admitted that he has no recollection of the incidents from July and October 2004. ECF No. 127-8 at 34, 40–41. He further admitted that he was paid night differential pay, and that he did not know the difference in amount between night differential pay and regular pay. ECF No. 127-8 at 26–28, 40. Moreover, Plaintiff Davis makes no attempt to explain how these alleged incidents resulted in material adverse consequences. *See, e.g.*, *Alford v. Defense Intelligence Agency*, 908 F. Supp. 2d 164, 171 (D.D.C. 2012) (granting summary judgment on retaliation claim related to denial of

49

compensatory time where plaintiff had demonstrated neither "any tangible harm associated with the incident, nor . . . explain[ed] how such an incident would have 'dissuade[d] a reasonable worker from making or supporting a charge of discrimination.'" (second alteration in original) (quoting *Burlington N.*, 548 U.S. at 57)). Here, there is a dearth of facts and argument to support Plaintiff Davis' claim of material adversity: "It is certainly plausible that [Plaintiff Davis] was disappointed by his supervisor's decision[s] and felt aggrieved . . . . Our Circuit, however, notes that 'not everything that makes an employee unhappy is an actionable adverse action.'" *Id.* (quoting *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006)).

Finally, Plaintiff Davis claims that, in the October 4, 2004 incident Commander Cooch "charged [him] 16 hours of AWOL." ECF No. 33, ¶ 6. As to this incident, too, Plaintiff Davis has since testified he has no recollection. ECF No. 127-8 at 40–41. More importantly, there is no explanation of what it means to be "charged" with AWOL or what the consequences of that charge are. To be sure, in his memorandum in opposition to Defendant's motion, he states that there was some ensuing "taking away [of] his pay." ECF No. 149 at 9. However, Plaintiff's declaration states no such consequence. ECF No. 33, ¶ 9. And even if there were some economic consequence, there is no suggestion as to the extent of it.

Plaintiff Davis fails to so much as mention in his memorandum in opposition any other conduct that might satisfy the requirement of a materially adverse consequence. Nor is one evident from the record before the Court. For example, the Amended Complaint claims that Plaintiff Davis was subject to unfair investigations, but fails to suggest any repercussions as a result of the investigations. "Generally, 'the "mere initiation" of an investigation may not constitute a materially adverse action.'" *Carter-Frost*, 305 F. Supp. 3d 60, 69 (D.D.C. 2018) (quoting *King v. Holder*, 77 F. Supp.3d 146, 151 (D.D.C. 2015); *see also Zelaya v. UNICCO Serv. Co.*, 733 F.

50

Supp. 2d 121, 131 (D.D.C. 2010) (finding, on summary judgment in retaliation case, that where plaintiff did not present evidence of repercussions from employer's investigation, there was no consequence that would deter a reasonable employee from making a charge of discrimination). Here, Plaintiff Davis does not suggest that these investigations resulted in consequences to him. And, even if they did, all his disciplines were rescinded. *See, e.g. Wade* 780 F. Supp. 2d at 17 (rescinded disciplines "generally not actionable"). Similarly, he complains of certain changes in administrative requirements, such as requiring reflective vests, denying access to police vehicles, modifying the reporting structure, and changing officers' schedules. ECF No. 25, ¶¶ 17, 33, 36, 62–63. Such administrative changes have been held not to be materially adverse. *See Tridico v. District of Columbia*, 130 F. Supp. 3d 17, 28 (D.D.C. 2015) (imposition of additional "administrative requirements," such as wearing police uniform, driving marked police car, being assigned responsibilities below seniority level, and being isolated from information "are not enough to dissuade a reasonable worker from making or supporting a charge of discrimination"); *Sims v. District of Columbia*, 33 F. Supp. 3d 7, 11 (D.D.C. 2014) (assignments that negatively affected work schedule not materially adverse); *Alford*, 908 F. Supp. 2d at 170–71 (plaintiff failed to show how requirement that he report to supervisors rose to the level of an adverse employment action where he "point[ed] to no evidence that this requirement was inappropriate for his grade or position, or that '[his] work hours or [his] pay were affected by the [requirement]'" (alterations in original) (quoting *Sewell v. Chao*, 532 F. Supp. 2d 126, 136 (D.D.C. 2008))). And his claims that BEP's use of private contractors precluded opportunities for overtime compensation and on the job training and development" (ECF No. 25, ¶¶ 14–15; ECF No. 149-2, ¶ 8) fail to state a material adverse consequence because they are insufficiently detailed, as well as because Plaintiff Davis fails to suggest how these changes affected him. There is no assertion, for example, that he would

have sought such overtime opportunities. *See, e.g., Sims v. District of Columbia*, 33 F. Supp. 3d 1, 8 (D.D.C. 2014) (noting that plaintiff failed to identify evidence from which a trier of fact could conclude that the loss of opportunity for overtime was a material adverse consequence where plaintiff did not allege that her supervisors knew she wanted to work overtime, she was interested in working overtime, or that she would have received overtime had circumstances been different).

In short, for the claims that are properly before the Court (other than his non-selection claims) Plaintiff Davis has failed to point to evidence of any material adverse consequence that accompanied the alleged discriminatory or retaliatory conduct in the Amended Complaint. *See, e.g., Baloch*, 550 F.3d at 1197 (affirming summary judgment in favor of defendant where plaintiff did not present evidence of adverse employment action); *Wade*, 780 F. Supp. 2d at 18 (granting summary judgment on claims where the alleged conduct "do[es] not constitute materially adverse action[]"). For these reasons, Defendant should be granted summary judgment on all of Plaintiff Davis' claims alleged in the Amended Complaint with the exception of his non-selection claims.

### c. Intentional Discrimination

Even if Plaintiff Davis had established one or more material adverse consequences, his claims for disparate treatment and retaliation fail for the independent reason that he has not adduced evidence that would allow a reasonable fact-finder to determine that he was intentionally discriminated against.

As discussed above, to establish unlawful discrimination, a plaintiff must show that he (1) is a member of a protected class; (2) suffered adverse employment action; and (3) was treated differently from similarly-situated employees outside the protected class. *See, e.g., Nichols*, 402 F. Supp. 2d at 65 (D.D.C. 2005). *Augustus v. Locke*, 934 F. Supp. 2d 220, 230 (D.D.C. 2013). To meet the similarly-situated requirement, "the alleged comparator 'must have dealt with the same

52

supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Toomer*, 2016 WL 9344023, at *28 (quoting *Phillips*, 937 F. Supp. at 37); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301–02 (D.C. Cir. 2015) (affirming grant of summary judgment for defendant where plaintiff failed to demonstrate that comparators were similarly situated to him); *Huckstep v. Washington Metro. Area Transit Auth.*, 216 F. Supp. 3d 69, 80–83 (D.D.C. 2016) (granting summary judgment to defendant where none of plaintiff's comparators were similarly situated to her).

For the bulk of his claims, Plaintiff Davis contends that he has raised an inference of racial discrimination because he, as an officer at the D.C. Facility, was treated differently than officers at the Texas Facility. As noted, the Amended Complaint explicitly makes that comparison for several allegedly discriminatory actions that it recites, and Plaintiff Davis' declaration in support of his opposition to Defendant's motion for summary judgment states that "[t]he best comparison" to show racial discrimination is that many of the "oppressive and harmful policies" enacted at the D.C. Facility were not enacted at the Texas Facility. ECF No. 149-2, ¶ 8. There are several problems with using the Texas Facility as a comparator for purposes of Plaintiff Davis' discrimination claims.

First, there is no competent evidence before the Court to support the allegation in the Amended Complaint that the Texas Facility had a primarily Caucasian police force. To be sure, Plaintiff Davis makes the conclusory pronouncement in his declaration that the police officers at the Texas Facility were "majority white," but there is no indication how he knows that. *Id.* At his deposition, when asked how he knew that fact, he responded with this confused explanation: "They have a roster and you're union, you can exchange rosters, you can ask questions and you

53

can mark off who's who from one union to another union and exchange that information." ECF No. 127-8 at 65. That is insufficient support for his supposed "knowledge" as to the race of the majority of the officers at the Texas Facility. Thus, Plaintiff Davis has failed at the first step to show that his comparators are outside the protected class.

Moreover, even were there such evidence, Plaintiff Davis has not shown that the officers at the D.C. Facility were similarly situated to those at the Texas Facility. While "determining whether . . . employees are similarly situated is ordinarily a question of fact for the jury," *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016), here, Plaintiff Davis has utterly failed to show that his comparators—who have been identified only as the officers at the Texas Facility— were subject to the same supervisors or standards or that theyengaged in similar conduct as did he. *See, e.g.*, *Huckstep*, 216 F. Supp. 3d at 81–82 ("[I]f a reasonable jury could not find that the putative comparator and the plaintiff are similarly situated, the court can decide, as a matter of law, that the two are not similarly situated."). The record is clear that neither Chief Lindsay nor Commander Cooch had operational control over the Texas Facility. ECF No. 127-3 at 2, ¶ 9; *id.* at 8, ¶ 5. Rather, the day-to-day operation of the Texas Facility's police force fell to that establishment's Plant Manager (*id.* at 3, ¶ 10), a fact that is even alleged in the Amended Complaint (ECF No. 25, ¶ 17). Further, there is no evidence, other than an occasional unsupported and conclusory statement (ECF No. 149-2, ¶ 10), that the duties of the officers at the Texas Facility were similar to those of the officers at the D.C. Facility. That is "insufficient to survive a motion for summary judgment." *Musgrove v. Gov't of D.C.*, 775 F. Supp. 2d 158, 166 (D.D.C. 2011) (statement that "[i]t is clear that principals in senior high schools who served during the same period of time would have more than comparable job duties" not sufficient to show that alleged comparators were similarly situated (alteration in original)); *see also Montgomery v. Chao*, 546

F.3d 703, 707 (D.C. Cir. 2008) ("'In the absence of evidence that the comparators were actually similarly situated' to [the plaintiff], an inference of . . . discrimination is not reasonable." (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 995–96 (D.C. Cir. 2002))); *Johnson v. Dong Moon Joo*, No. Civ.A. 01-0004 CKK, 2016 WL 627154, at *23 (D.D.C. Mar. 12, 2006) (finding comparator not similarly-situated where plaintiff "provide[d] no record evidence to support her conclusory allegation, nor ma[de] any attempt to analyze the way in which [the comparator's] duties and responsibilities . . . compared to her own duties . . . .").

The claims based on policies that affected the entire D.C. Facility's police force, which include all of the operational and administrative changes imposed by Commander Cooch, as well the BEP legal department's interpretation of federal law, are faulty for another reason. It is undisputed that the Police Operations Division included Caucasian officers and Hispanic officers as well as African-American officers. ECF No. 127-3 at 2, ¶ 4; ECF No. 127-8 at 12. Where an allegedly discriminatory policy or incident affects all members of a department, including members who are not part of the protected class at issue, that does not establish that the defendant "harbored animus towards Plaintiff because of" his membership in that protected class. *Holmes v. Branch Banking & Tr. Co.*, No. 1:14-CV-01366 (APM), 2016 WL 7334709, at *8 (D.D.C. Dec. 9, 2016); *see also Carter-Frost*, 305 F. Supp. 3d at 72 (where an employee not in the protected class endured the same treatment alleged to be discriminatory, "a reasonable jury could not find that the [defendant] was motivated by" the plaintiff's membership in that protected class).

To be sure, the Amended Complaint and other submissions include some allegations of discriminatory actions that did not affect the entire D.C. Facility's police force, but that were targeted at Defendant Davis. These consist of ordering investigations of Plaintiff Davis, including the investigation related to the "key inventory," ECF No. 25, ¶¶ 29, 41; ECF No. 149-18 at 5–6;

55

improperly seizing his weapon, *id.*, ¶ 30; denying him the opportunity to act as a tactical training instructor, *id.*, ¶ 57; denying him overtime pay, *id.*, ¶ 59–61, 67; and charging him with being AWOL, *id.*, ¶ 67. In the record before the Court, the only two of those claims for which there is anything resembling support for an allegation of racially discriminatory animus is the "key inventory" investigation and the allegedly improper seizing of his gun. As to the former incident, Plaintiff Davis testified at his deposition that he was "singled out" because other officers also failed to do key inventories and were not disciplined. ECF No. 149-18 at 6. But there is no indication of who these other officers were, or if they were outside of the protected class. Thus, this is not evidence that would allow a reasonable fact-finder to conclude that the punishment was motivated by Plaintiff Davis' membership in that protected class. *See, e.g.*, *Carter-Frost*, 305 F. Supp. 3d at 74 (granting summary judgment against plaintiff who failed to show that employees treated more favorably were outside plaintiff's protected class). The problem with the weapons-seizure allegation is more fundamental. The government presents evidence that the seizure was made in relation to an investigation into whether an officer had fired a gun in the elevator. ECF No. 127-5 at 15. In response, "[a]ll police officers turned in their weapons so they could be tested." *Id.* As with many of Plaintiff Davis' other allegations, this does not amount to evidence of racial animus.

Finally, there are Plaintiff Davis' non-selection claims. As to the 2002 Vacancy, no selection was made, and Plaintiff Davis has provided no evidence that the decision was racially-motivated. Generally, it is difficult to make out a non-selection claim where the position is cancelled because the plaintiff cannot show "that the employer continued to seek applicants with plaintiff's qualifications." *Marshall v. James*, 276 F. Supp. 2d 41, 57 n.9 (D.D.C. 2003), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). However, the D.C. Circuit has held that a claim that a position was administratively cancelled in

order to deny the promotion to an African-American candidate survived summary judgment where there was evidence that several non-African Americans were promoted at around the same time, the agency gave differing explanations as to why the position was cancelled, and no one admitted to making the decision to cancel the position. *Evans v. Sibelius*, 716 F.3d 617, 620–21 (D.C. Cir. 2013). Plaintiff Davis produces no similar evidence here.

Plaintiff bases his three other non-selection claims on the allegation that candidates who were less qualified than he were hired for the positions. ECF No. 149 at 7–8. For each of these vacancies, Defendant responds that the best qualified candidates were hired. ECF No. 127-3 at 13, ¶ 29 (2003 Vacancy), 15, ¶ 37 (2004 Vacancy), *id.*, ¶ 42. Defendant has provided evidence that, for the 2003 Vacancy (for which the candidates were not scored by a committee, because Commander Cooch interviewed them all himself), Commander Cooch chose the candidates that he identified as the best qualified, and that for the 2004 Vacancy and the 2005 Vacancy, he chose the candidates with the highest scores. ECF No. 127-6 at 5 (2002 Vacancy); ECF No. 127-7 at 2 (2004 Vacancy); *id.* at 16–17 (2005 Vacancy). "To prevail on a relative qualifications claim, [a plaintiff] must show that she is '*significantly* better qualified for the job than [the applicant] ultimately chosen.'" *Grosdidier*, 709 F.3d at 25 (second alteration in original) (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008)). This is because,

> [as] the D.C. Circuit has long maintained . . . , "[I]n a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." Thus, where the evidence shows only "slight questions of comparative qualifications," it cannot be said to be sufficient to establish a genuine issue of fact regarding the starkly superior credentials that are necessary to survive a summary judgment challenge.

*Mount v. Johnson*, 174 F. Supp. 3d 553, 564–65 (D.D.C.) (Ketanji Jackson, J.), *aff'd*, 664 F. App'x 11 (D.C. Cir. 2016) (quoting *Aka*, 156 F.3d at 1294). However, a plaintiff "is not limited to

57

comparing [his] qualifications to [those of the applicants selected]; [he] can still 'seek to expose other flaws in the employer's explanation." *Thompson v. McDonald*, 169 F. Supp. 3d 170, 184 (D.D.C. 2016) (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012)). For example, he can attempt to show "inconsistencies or irregularities in an employer's established hiring process" or present "other evidence, either direct or circumstantial, that permits an inference of discrimination." *Raymond v. Architect of the Capitol*, 49 F. Supp. 3d 99, 111 (D.D.C. 2014) (quoting *Hyson v. Architect of the Capitol*, 802 F. Supp. 2d 84, 98 (D.D.C. 2011)). No matter which strategies the plaintiff chooses, it is his burden to present evidence that would allow a reasonable jury to show that the defendant's "explanation was made up to disguise illegitimate bias." *Thompson*, 169 F. Supp. 3d at 181 (quoting *Aka*, 156 F.3d at 1299).

Plaintiff Davis offers no such evidence here. For example, he provides no information about the qualifications of the applicants who received the promotions he was denied. That makes it impossible to evaluate whether Plaintiff Davis was significant*ly* better qualified than they. *See Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 159–60 (D.D.C. 2013) ("The plaintiff provides no information other than the titles regarding the seven jobs for which she unsuccessfully applied, nor how her qualifications compared to the selected candidates. Without some showing that the plaintiff was significantly more qualified than the selected candidates, her non-selection for other positions, no matter how many, is simply not sufficient to support an inference of discrimination or to show pretext . . . ."); *Cf. Thompson*, 169 F. Supp. 3d at 182–84 (evaluating the comparative qualifications of the candidate selected for promotion and the plaintiff). Although he testified at deposition that he trained many of the officers promoted over him (ECF No. 149-18 at 12–13) he presents no evidence that he was more qualified than they were at the time of the selections. *See, e.g., Nurriddin*, 382 F. Supp. 2d at 104 (requiring evidence that the applicant chosen for promotion

58

and the plaintiff were similarly qualified at the time of the promotion). Nor does he suggest that "procedural irregularities in the selection process . . . demonstrate that [Defendant's] justification for [the] . . . promotion decision[s] was pretextual," both because he "does not establish that [the] interview process[es] [were] 'irregular,'" and because he does not show that the successful candidates were treated differently than he was. *Thompson*, 169 F. Supp. 3d at 187–88 (quoting *Kilby-Robb v. Duncan*, 77 F. Supp. 3d 164, 174 (D.D.C. 2015)). And even if he had, mere procedural irregularities are "not sufficient to establish that [the] defendant's proffered explanation is pretextual absent some actual evidence that [the] defendant acted on a motivation to discriminate against [the] plaintiff based on [his] . . . race . . . ." *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 312 (D.D.C. 2005).

Instead, Plaintiff Davis points to allegedly discriminatory conduct on the part of Commander Cooch—specifically, his September 17, 2004 email regarding the experiment using monkeys, his June 2, 2006 email regarding undocumented workers in California, and his November 2006 comment to Sgt. Tisino about the banana in his holster. ECF No. 149 at 6–7. As discussed below in Section III.B.2, *infra*, those comments are not sufficient evidence of racial animus against African-Americans. Moreover, any attempt to show racial bias in the challenged promotion selections is undercut by the fact that, for each of those vacancies, at least one African-American candidate was promoted. ECF No. 1027-3 at 13, ¶¶ 28–29 (2003 Vacancy, four African-American candidates promoted), *id.* at 15, ¶ 37 (2004 Vacancy, two African-American candidates promoted), *id.* at 15, ¶ 43 (2005 Vacancy, one African-American candidate, one Caucasian candidate, and one Hispanic candidate promoted). As Judge James E. Boasberg has observed:

> The failure-to-hire context seems particularly unlikely to yield a situation where an employer rejects a person on a prohibited basis, yet hires someone else from the same protected class. If an employer rejects someone because he has dark skin or

because he is not Lebanese, it is hard to imagine the employer simultaneously filling the spot with someone else with those same scorned characteristics.

*Almutairi v. Int'l Broad. Bureau*, 928 F. Supp. 2d 219, 233 (D.D.C. 2013); *see also Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) ("[A] replacement within the same protected class cuts strongly against any inference of discrimination.").

For these reasons, Defendant's motion for summary judgment should be granted as to Plaintiff Davis' claims of disparate treatment.

### d. Retaliation

As noted above, to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action. *Burlington*, 548 U.S. at 67–69; *Jones*, 557 F.3d at 677. Where, as here, the plaintiff fails to present more direct evidence of causation, a causal connection can be drawn "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000). However, the temporal connection must be "very close"—the Supreme Court has noted that courts have rejected such claims where even three months had passed. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)); *see also Lawson v. Sessions*, 271 F. Supp. 3d 119, 137 (D.D.C. 2017) (Brown, Ketanji, J.) ("When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as the outer limit." (quoting *Greer v. Bd. of Trustees of Univ. of D.C.*, 113 F. Supp. 3d 297, 311 (D.D.C. 2015))); *Allen v. Napolitano*, 774 F. Supp. 2d 186, 201 n.2 (D.D.C. 2011) ("In the D.C. Circuit, courts have held that alleged retaliatory acts must occur within three or four months of the

60

protected activity to establish causation by temporal proximity."). In other words, "retaliation claims must be proved according to traditional principles of but-for causation." *Farzam v. Shell*, Civil Action No. 12-35 (RMC), 2015 WL 8664184, at *4 (D.D.C. Dec. 11, 2015). "However, but-for causation does not mean that retaliation must be the only cause of the employer's action—merely that the adverse action would not have occurred absent the retaliatory motive." *Id.*

Plaintiff Davis' retaliation claims do not survive Defendant's motion for summary judgment for some of the same reasons that his disparate treatment claims fail. To the extent that Plaintiff Davis relies on the allegation that officers at the Texas Facility were treated more favorably than those at the D.C. Facility to support his retaliation claims, the argument fails because he has not shown that the officers at the Texas Facility are "'outside' [Plaintiff Davis'] 'protected group,' that is, employees who engage in protected activity." *Carter-Frost*, 305 F. Supp. 3d at 74. Similarly, the broadly applicable policies and the weapons seizure that Plaintiff Davis complains about affected all officers at the D.C. Facility, and there is no evidence that all officers engaged in protected activity. *Id.* at 72 (where an employee not in the protected class endured the same treatment alleged to be discriminatory, "a reasonable jury could not find that the [defendant] was motivated by" the plaintiff's membership in that protected class).

As to the allegations that Plaintiff Davis was targeted for retaliation, he argues vaguely that "[t]he same facts which support [Plaintiff] Davis' harassment claims also support his retaliation claim," pointing, again, to "the non-selections, refusal to allow [him] to serve as a tactical instructor, [and] unwarranted discipline or intimidation."[28] ECF No. 14-9 at 12. There is no

---

[28] Plaintiff Davis asserts that Defendant "overlooked" the retaliation claims in his motion for summary judgment but recognizes that Defendant intended to seek summary judgment on all of Plaintiff Davis' claims. ECF No. 149 at 11. As Defendant explains in his reply memorandum, however, the motion for summary judgment addresses the allegations in the Amended Complaint claiming retaliation. ECF No. 157 at 8–9.

attempt to link explicitly any specific allegedly retaliatory conduct to any specific allegedly protected activity. On this basis alone, plaintiff Davis' retaliation claims should be denied. *See, e.g., Gilbert v. Napolitano*, 670 F.3d 258, 262 (D.C. Cir. 2012) ("To create a triable issue of fact on [a retaliation] claim, aside from establishing pretext, [the plaintiff] must offer evidence that he engaged in protected activity . . . and that a causal link connects the protected activity [to the alleged retaliatory conduct]."); *see also Mason v. Geithner*, 811 F. Supp. 2d 128, 201 (D.D.C. 2011) (granting summary judgment in favor of defendant on retaliation claim where plaintiff made "no attempt to connect the alleged [retaliatory] incident to [the plaintiff's] participation in protected activity").

Nevertheless, the undersigned has scoured the record to determine if Plaintiff Davis has a viable retaliation claim. He does not. The record before the Court includes or references grievances or complaints by Plaintiff Davis dated October 1, 1998 (ECF No. 149-10); May 20, 2003, ECF No. 149-11); January 20, 2004 (ECF No. 149-12); February 2, 2005 (ECF No. 157-2 at 3); May 7, 2005 (ECF No. 149-13); November 18, 2005 (ECF No. 127-5 at 13); and December 11, 2006 (ECF No. 149-17).[29] Of those seven, four—from May 20, 2003, January 20, 2004, May 7, 2005, and November 18, 2005—make no mention of racial discrimination and therefore cannot be the basis for a retaliation claim under Title VII. *See, e.g., Gilbert*, 670 F.3d at 262 (defining protected activity sufficient for a Title VII retaliation claim as "oppos[ing] any practice made an unlawful employment practice by [Title VII]" (second alteration in original) (quoting 42 U.S.C. § 2000e-3(a)); *Robbins v. District of Columbia*, 67 F. Supp. 3d 141, 146 (D.D.C. 2014) ("But union

---

[29] Plaintiff Davis claims that he was included in an October 24, 2004 complaint by Arthur Haynesworth, which sought to represent a number of African-American officers at the D.C. Facility. ECF No. 149-1 at 9, ¶ 8. However, the record includes only the first page of that complaint, and Plaintiff Davis is not mentioned in it. ECF No. 149-7 at 1. There is therefore no evidence that Plaintiff Davis engaged in this protected activity. Even if there were, it would not change the analysis.

grievances and general complaints about unfair treatment do not constitute protected activity under Title VII."), *aff'd*, 650 F. App'x 37 (D.C. Cir. 2016). That means, according to the record before the Court, Plaintiff Davis engaged in protected activity under Title VII on October 1, 1998, February 2, 2005, and December 11, 2006. ECF No. 149-10; ECF No. 157-2; ECF No. 149-17. The alleged timeline of retaliation therefore looks like this:

| | |
|---|---|
| October 1, 1998: | Plaintiff Davis complains of racial discrimination (ECF No. 149-10); |
| September 2002: | 2002 Vacancy cancelled (ECF No. 127-5 at 23); |
| March 14, 2003: | 2003 Vacancy filled (ECF No. 127-1, ¶¶ 78–79); |
| December 8, 2003: | 2004 Vacancy filled (*id.*, ¶ 97); |
| April 26, 2004: | Plaintiff Davis' request to act as tactical instructor denied (ECF No. 25, ¶ 57); |
| August 4, 2004: | Plaintiff Davis is denied permission to work overtime (*id.*, ¶ 59); |
| October 8, 2004: | Plaintiff Davis is charged with being AWOL (*id.*, ¶ 67); |
| October 15, 2004: | Plaintiff Davis is denied overtime pay (*id.*, ¶ 61); |
| Fall 2004: | Plaintiff Davis is investigated regarding "unpleasant comments" made during roll call (ECF No. 127-5 at 15); |
| February 2, 2005: | Plaintiff Davis complains of racial discrimination (ECF No. 157-2); |
| March 17, 2005: | Plaintiff Davis is interviewed in connection with hidden cameras investigation (ECF No. 25, ¶ 41); |
| May 12, 2005: | 2005 Vacancy filled (ECF No. 127-3, ¶¶42–43); |
| December 11, 2006: | Plaintiff Davis complains of racial discrimination (ECF No. 149-17). |

Clearly, the alleged retaliatory act in 2002 is too remote from the 1998 complaint for a reasonable jury to infer retaliatory intent. *See, e.g.*, *Lawson*, 271 F. Supp. 3d at 137 (noting three months as

perceived "outer limit"). The only allegedly retaliatory actions that occur within an appropriately short amount of time from relevant protected activity are the March 17, 2005 investigation, which followed within one and one-half months of Plaintiff Davis' February 2, 2005 complaint, and perhaps the May 2005 non-selection, which is just over three months from that same complaint. Even if the timing could support some kind of causal relationship between the protected activity and those two subsequent events, a retaliation claim would fail. First, a mere investigation is generally not a material adverse consequence, even in the retaliation context. *Zelaya*, 733 F. Supp. 2d at 131 (D.D.C. 2010) ("Plaintiff does not produce sufficient evidence that she suffered tangible job consequences resulting from the monitoring that would prevent a reasonable employee from bringing or supporting a discrimination claim."); *Brown v. Mills*, 674 F. Supp. 2d 182, 191–92 (D.D.C. 2009) ("The Court finds that the OIG investigation of Ms. Brown and the subsequent verbal instruction she received are not materially adverse because no reasonable jury could conclude that these actions would have dissuaded a reasonable worker from complaining of discrimination."). And a claim of retaliation based on Plaintiff Davis' unsuccessful attempt to fill the 2005 Vacancy flounders because, as discussed above, he has not shown that he was significantly more qualified than the officers who filled the vacancies. *See, e.g., Porter v. Shah*, 606 F.3d 809, 815 (D.C. Cir. 2010) (affirming grant of summary judgment to the defendant on retaliation claim based on non-selection where the plaintiff did not show he was substantially more qualified than the candidate chosen); *Warner*, 956 F. Supp. 2d at 159–60 (granting summary judgment for defendant on disparate treatment and retaliation claims where plaintiff did not produce evidence showing she was significantly more qualified than the selected candidates). Nor has he otherwise called into question the reasons given by Defendant for making that selection or the process used to make it. *Cf. Thompson*, 169 F. Supp. 3d at 187–88.

For these reasons, Defendant's motion for summary judgment should be granted as to Plaintiff Davis' retaliation claims.

2.    Hostile Work Environment and Retaliatory Harassment Claims

As outlined above, "[t]o determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. Isolated incidents, offhand comments, and teasing are not severe or pervasive enough to rise to the level of creating a hostile work environment. *See Faragher*, 524 U.S. at 788. Rather, actions constituting a hostile work environment generally must be facially discriminatory. *See Ware*, 80 F. Supp. 3d at 232 ("Plaintiff's reliance on facially-neutral conduct, without any evidence to link that conduct to his protected class, cannot save his . . . hostile work environment claim."). Moreover, a plaintiff must show that the actions are "adequately linked into a coherent hostile environment claim," such as when the same managers engage in repeated discriminatory conduct of the same type. *See Baird*, 662 F.3d at 1251. Plaintiff Davis has not accomplished that task here.

In support of his claims, Plaintiff Davis points principally to Commander Cooch's September 17, 2004 email and his November 16, 2006 comment about a "banana in his holster." ECF No. 149 at 9. He further lists other incidents, which he admits are not "overtly racist," but which he claims "impacted the terms and conditions of [his] employment," such as the four non-selections, "unwarranted discipline[,] denying work[-]enhancing opportunities such as serving as a tactical training instructor, denying overtime," and charging him as AWOL. *Id.* The following

65

is a rough schedule of the incidents that Plaintiff Davis alleges created a hostile work environment:[30]

September 2002:     the 2002 Vacancy is cancelled (ECF No. 127-1, ¶¶ 66–67; ECF No. 127-5 at 23);

March 14, 2003:     2003 Vacancy filled (ECF No. 127-1, ¶ 78–79);

December 8, 2003:   2004 Vacancy filled (*id.*, ¶ 97);

April 26, 2004:     Plaintiff Davis is denied permission to act as tactical instructor (ECF No. 25, ¶ 57);

August 4, 2004:     Plaintiff Davis is denied permission to work overtime and questioned (*id.*, ¶ 59);

September 17, 2004: Commander Cooch sends the email regarding a monkey experiment (ECF No. 149-9 at 1);

Fall 2004:          Plaintiff Davis is investigated regarding "unpleasant comments" made during roll call (ECF No. 127-5 at 15);

October 8, 2004:    Plaintiff Davis is charged with being AWOL (ECF No. 25, ¶ 67);

October 15, 2004:   Plaintiff Davis is denied overtime pay (*id.*, ¶ 61);

March 17, 2005:     Plaintiff Davis is interviewed in connection with the hidden camera investigation (*id.*, ¶ 41);

May 12, 2005        2005 Vacancy filled (ECF No. 127-3 at 9, ¶¶ 42–43);

June 2, 2006:       Commander Cooch sends the email regarding undocumented workers in California (ECF No. 149-16);

November 16, 2006:  Commander Cooch makes the "banana" comment (ECF No. 149-17 at 1, 3).[31]

---

[30] Plaintiff Davis admitted that he dressed in a male locker room and that no female officer dressed in that locker room. ECF No. 127-8 at 42. That allegation is therefore not included here.

[31] Defendant argues that the Amended Complaint does not mention Commander Cooch's June 2, 2006 email or his "banana" comment and that those incidents are therefore not properly before the Court. ECF No. 157 at 5–6 nn.2–3. However, courts have held that,

> when it comes to hostile work environment claims, the unlawful employment action is the environment itself, viewed as an indivisible whole. Consistent with this framework, a plaintiff

That is, Plaintiff Davis suggests that these thirteen disparate incidents occurring over a period of more than four years, were so severe and pervasive that they created an "abusive working environment." *Baloch*, 550 F.3d at 1201. Plaintiff is incorrect. The undersigned concludes that these incidents, even taken together, are insufficient to allow "a reasonable jury to . . . find that the [BEP] created a severely hostile work environment based upon [either] of his protected statuses," that is, his race or the fact that he previously engaged in protected activity. *Bowden v. Clough*, 658 F. Supp. 2d 61, 85 (D.D.C. 2009).

A primary problem is that Plaintiff Davis has merely "compil[ed] a laundry list of employment actions and lump[ed] them together under the umbrella of a hostile work environment theory" without "attempt[ing] to show that the alleged actions are related in time or type such that would allow a reasonable trier of fact to conclude that they congeal into a coherent hostile work environment." *Mason*, 811 F. Supp. 2d at 195 (D.D.C. 2011), *aff'd* 492 F. App'x 122 (D.C. Cir. 2012); *see also Toomer*, 2016 WL 9344023, at *23 ("To make a claim for a retaliatory hostile work environment, plaintiff must prove not only that the acts she complains of are connected to her protected activity, but also that the acts of retaliation are sufficiently related to each other such that they can be considered 'a connected stream of behavior.'" (quoting *Chaple v. Johnson*, 453 F. Supp. 2d 63, 74 (D.D.C. 2006))); *Baloch v. Norton*, 517 F. Supp. 2d 345, 363 (D.D.C. 2007) (a hostile work environment claim must be "greater than the sum of its parts"), *aff'd* 550 F.3d 1191 (D.C. Cir. 2008). Even the four non-selections, which are similar in nature to one another, are not

---

asserting a hostile work environment claim is not required to plead "each element of [his] claim in [his] Complaint," "nor specify in exhaustive detail each and every component act comprising the allegedly hostile or abusive work environment[.]"

*Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 300–01 (D.D.C. 2012) (alterations in original) (citations omitted) (first quoting *Tucker v. Howard Univ. Hosp.*, 764 F. Supp. 2d 1, 9 (D.D.C.2011), then quoting *Graves v. District of Columbia*, 777 F. Supp. 2d 109, 121 (D.D.C.2011)).

sufficiently related to support a coherent, cognizable hostile work environment claim. *See, e.g.,* *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) ("[C]obbling together a number of distinct, disparate acts will not create a hostile work environment. For example, if an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate claims under Title VII, but it would not create a hostile work environment claim based on pervasive intimidation, insult and ridicule.").

Moreover, Plaintiff Davis appears to admit that the bulk of the conduct at issue is not facially racially discriminatory, a conclusion compelled by any fair reading of these facts. ECF No. 149 at 9 (indicating that conduct was not "overtly racist"). He does, however, contend that the Commander Cooch's September 17, 2004 email, June 2, 2006 email, and November 16, 2006 comment were "racially derogatory" or "racially discriminatory." *Id.* at 6–7. Nevertheless, those three incidents, alone or in combination, did not create a hostile work environment.

First, neither the September 17, 2004 email nor the June 2, 2006 email was sent to Plaintiff Davis. ECF No. 149-9 at 1; ECF No. 149-16 at 1. While incidents of alleged workplace racism that do not directly involve a plaintiff "may be relevant to whether there is a hostile work environment," courts "should be careful when weighing [such] evidence, especially when it is not direct and strong evidence of racial animus." *Dudley v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 166–67 (D.D.C. 2013); *see also Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 103 (D.D.C. 2012) (discounting allegedly discriminatory "acts [that] were not directed at the plaintiff"); *Kelley v. Billington*, 370 F.Supp.2d 151, 159 (D.D.C. 2005) ("An[] important factor in assessing whether harassment was sufficiently 'severe,' 'pervasive' and 'abusive' is whether the incidents of harassment are directed at others, rather than at plaintiffs."); *Lester v. Natsios*, 290

F. Supp. 2d 11, 31 (D.D.C. 2003) ("Conduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment").

Second, the three incidents are not sufficiently severe to "rise to the level of conduct actionable as a hostile work environment under Title VII." *Marshall v. James*, 276 F. Supp. 2d 41, 53 n.6 (D.D.C. 2003), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). As Defendant points out, the September 17, 2004 email described a purported experiment using monkeys that has been used to explicate human behavior, and has been discussed in both scientific circles and in the corporate world. ECF No. 127-2 at 32 & n.17. Commander Cooch prefaced the description of the experiment with the question, "Does your company work this way?" ECF No. 149-9 at 1. Moreover, in a memorandum disseminated to the police force at the D.C. Facility, Commander Cooch explained his understanding that "[t]he illustration used in the email is one of a number of widely used management training tools used to illustrate the need for receptiveness to change in organizations."[32] To be sure, "'[g]iven the history of racial stereotypes against African-Americans and the prevalent one of African–Americans as animals or monkeys, it is a reasonable—perhaps even an obvious—conclusion that the use of monkey imagery is intended as a racial insult where no benign explanation for the imagery appears." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012). Here, however, Defendant offers a plausible benign explanation for the email that does not involve the "racial insult" that can be inferred from certain uses of monkey imagery. *Toomer*, 266 F. Supp. 3d at 195 (presence of ape- or monkey-like action figure in office did not contribute to hostile work

---

[32] Plaintiff's assertion that Commander Cooch's January 14, 2005 memorandum "acknowledged the inappropriateness of the racially tinged September 17, 2004 email" (ECF No. 149 at 6) is not accurate. While Commander Cooch stated that he was "pained to learn that the intended message of the email was misunderstood as offensive by some," ECF No. 149-15 at 2, nowhere did he assert or suggest that the email was inappropriate or racially-tinged.

69

environment where there was a benign explanation for it); *cf. Burkes v. Holder*, 953 F. Supp. 2d 167, 179 (D.D.C. 2013) (allegation of prominent display of stuffed monkey hanging from noose in public work area sufficient to overcome motion to dismiss hostile work environment claim).

Similarly, the June 2, 2006 email regarding undocumented workers is not sufficient evidence of a hostile work environment. Although the email spouts questionable statistics claiming a connection between undocumented workers and criminal behavior, among other things (ECF No. 149-16), it is not obviously connected to Commander Cooch's alleged racial animus against African-Americans, the protected group of which Plaintiff Davis is a member. Rather, it ostensibly makes a comment on immigration policy. *Id.* And, although some courts have found that purported political commentary can be a proxy for racially demeaning conduct, there must be more of a connection than has been made here between the statement and other hostile conduct at issue. *See, e.g.*, *Williams v. Phillips 66 Co.*, 72 F. Supp. 3d 938, 957 (S.D. Ill. 2014) (political email denigrating tax plan of presidential candidate Barack Obama could contribute to racially hostile work environment that included repeated use of racially derogatory epithets, comments that "all blacks look and sound alike," and the appearance of a "picture of a monkey with the name Obama scrawled on it").

Plaintiff Davis does attempt to connect Commander Cooch's "banana" comment of November 16, 2006, to the September 17, 2006 email, but the attempt is unavailing. First, the only evidence of the alleged comment is Plaintiff Davis' statement that in a written grievance that Commander Cooch said to Sergeant Tisino, "I want you to tell Corporal Greg Davis the other day I got dressed I had to come down and get my weapon, I am always duty ready, because I had my banana in my holster." ECF No. 149-17 at 1. Coming from Plaintiff Davis, Sergeant Tisino's statement is hearsay within hearsay, which has no evidentiary value at the summary judgment

70

stage.[33] *See, e.g., Sewell v. Chao*, 532 F. Supp. 2d 126, 141 (D.D.C. 2008) (statement attributed to plaintiff's supervisor by third party is inadmissible because "even if [the] statement is admissible as an admission by a party opponent, there is no exception that would permit plaintiff to testify as to what [the third party] . . . said to her"). A party may not rely on hearsay to overcome a motion for summary judgment. *See, e.g., Bergbauer*, 934 F. Supp. 2d at 66 n.4 (refusing to consider "hearsay within hearsay" for purpose of opposition to summary judgment motion); *Vasquez-Mills v. District of Columbia*, 278 F. Supp. 3d 167, 175 (D.D.C. 2017) ("'[S]heer hearsay . . . counts for nothing' on summary judgment . . . ." (second alteration in original) (quoting *Gleken v. DCCC*, 199 F.3d 1365, 1369 (D.C. Cir. 2000))).

Second, Plaintiff Davis' interpretation of Commander Cooch's alleged statement is idiosyncratic, at best. The statement itself is nearly gibberish. Plaintiff Davis, however, takes the phrase about a "banana in my holster" to hearken back to the September 17, 2004 email, because that email also mentioned a banana. ECF No. 149-17 at 1. The connection is strained to say the least. In cases in which the mention or use of bananas has been found to support a racially demeaning interpretation, again, the relationship between the statement or incidents and other objectionable conduct has been much closer. *See, e.g., Jones*, 683 F.3d at 1301–02 (multiple instances of bananas being placed on plaintiff's truck, in connection with threatening confrontation with colleagues who wore clothing emblazoned with Confederate flag created genuine issue of material fact as to hostile work environment claim); *Kemp v. CSX Transp., Inc.*, 993 F. Supp. 2d 197, 206, 213 (N.D.N.Y. 2014) (repeated instances of racially derogatory name-calling in connection with repeated comments that plaintiff should "get back on a banana boat and go back

---

[33] Plaintiff Davis' opposition does not establish that either Sgt. Tisino or Commander Cooch has averred that Commander Cooch made the statement Plaintiff Davis attributed to him. Rather, as noted above, the only evidence regarding the comment is Plaintiff Davis' statement in a grievance that Sgt. Tisino told him that Commander Cooch had made the comment to her.

71

to Jamaica" created genuine issue of material fact as to hostile work environment). Here, Plaintiff Davis provides no reason to overcome Defendant's plausible benign interpretation of the September 17, 2004, so the attempted bootstrapping fails. Similarly unsupported is Plaintiff's understanding of Commander Cooch's statement that he "is always duty ready" as a threat. ECF No. 149-17 at 3. Indeed, Plaintiff Davis' own explanation of that comment—that Commander Cooch was a retired Metropolitan Police Department commander "whose authority in an off-duty status will allow him to bear his personal sidearm," *id.*—does not reasonably connote a threat. In sum, the statement is too amorphous to support a federal cause of action for racial harassment.

Additionally, Plaintiff Davis has utterly failed to connect these comments to his retaliatory harassment claim other than with the conclusory argument that "[t]wo years after sending the "Monkey" email and [Plaintiff] Davis' complaint regarding the same and after numerous complaints by [Plaintiff] Davis, [Commander] Cooch, through [Sergeant] Tisino, made a threatening reference concerning his gun as a banana and being ready for [Plaintiff] Davis." ECF No. 149 at 11. That is insufficient. Indeed, it also discloses another flaw. Even if these three events over a period of two years—or the thirteen events Plaintiff identifies over a period of four years—are considered racially-charged or retaliatory, they are not sufficiently pervasive to create a hostile work environment. *See, e.g.*, *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (holding that several discriminatory incidents spread over a seven-year period did not constitute pervasive conduct); *see also, e.g.*, *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (citing *Hopkins*' holding regarding pervasiveness with approval); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he alleged events are temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness."); *Rattigan*, 503 F. Supp. 2d at 79 (dismissing

72

hostile work environment claim and noting how the comments were "spread out over a period of two years").

For these reasons, Defendant's motion for summary judgment should be granted as to Plaintiff Davis' hostile work environment and retaliatory harassment claims.

### C.     Motion for Summary Judgment Against Plaintiff Joy

#### 1.     Compliance with Rule 56 of the Federal Rules of Civil Procedure

Taking the Amended Complaint as a template, Defendant seeks summary judgment in its favor as to each of Plaintiff Joy's claims, as well, and has supported his motion, as required, with a statement of undisputed material facts supporting his factual and legal arguments.  ECF No. 128-1; ECF No. 128-2; *see* Fed. R. Civ. P. 56(c)(1).   Pursuant Rule 56(c) of the Federal Rules of Civil Procedure, a party may dispute a fact relied on by the opposing party by citing particular parts of the record to support its assertion that the fact is not undisputed or by showing that the materials the proponent cites in support of the fact do not establish the fact.  Under Rule 56(e)(2) and Local Civil Rule 7(h), where a party fails to properly dispute the other party's assertion of fact, the court may consider that fact undisputed for the purposes of the motion.  *See, e.g., Lawrence v. Lew*, 156 F. Supp. 3d 149, 153–156 (D.D.C. 2016) (discussing requirements of Rule 56 and Local Civil Rule 7(h)).  Thus, it is from those submissions that the Court "must determine which material facts, if any, remain in dispute." *Id.* at 154.

Plaintiff Joy's responses are deficient.  Although the submissions of a *pro se* litigant like Plaintiff Joy "must be held to less stringent standards than formal [documents] drafted by lawyers," when responding to a motion for summary judgment, "even a *pro se* plaintiff must comply with the Federal Rules of Civil Procedure and this Court's local rules, including this Court's rules regarding responding to statements of material fact and marshalling record evidence." *Hedrick v.*

73

*FBI*, 216 F. Supp. 3d 84, 93 (D.D.C. 2016) (Jackson, Ketanji, J.) (alteration in original) (citations omitted) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)); *see also MacLeod v. U.S. Dep't of Homeland Security*, No. 15-cv-1792, 2017 WL 4220398, at *7 (D.D.C. Sept. 21, 2017) (Jackson, Ketanji, J.) ("[W]hen faced with a motion for summary judgment, a *pro se* plaintiff, just like a represented party, must comply with a court's rules regarding responses to statements of material fact and the need to identify record evidence that establishes each element of his claim for relief."); *Thompson v. Veterans Canteen Serv.*, 156 F. Supp. 3d 22, 26 (D.D.C. 2016) (crediting defendant's evidence where *pro se* plaintiff failed to comply with Local Civil Rule 7(h)). Neither of Plaintiff Joy's responses to the materials submitted in connection with Defendant's motion for summary judgment complies with the Federal Rules of Civil Procedure or this Court's Local Civil Rules.

Instead, her first submission (ECF No. 150) responds to the assertions included in Defendant's statement of undisputed material facts with objections that are often irrelevant to the specific fact challenged and with unsworn, unsupported, and generalized allegations of discriminatory intent on the part of Chief Lindsey and Commander Cooch. She also includes allegations wholly unrelated to the issues in this case, such as assertions that certain BEP police officers were robbed, and one was killed, by apparently unknown assailants in the area around the D.C. Facility, *id.* at 3, and other allegations of alleged discriminatory conduct that post-dates the filing of the Amended Complaint by years, *id.* at 15 (alleging retaliatory termination in November 2015). And she attaches over 100 pages of documents without providing guidance as to how those documents are relevant to the specific claims in this case. ECF No. 150-1. That is, "in nearly every paragraph of her response, [Plaintiff Joy] fails to meaningfully respond to defendant's factual assertions. Indeed, many of [Plaintiff Joy's] responses do not address whether the asserted

fact is true or false," but rather object to the statement by discussing "other facts which [she] apparently believes ought to be considered in connection with the asserted fact." *Toomer*, 2016 WL 9344023, at *4.

Plaintiff Joy's second submission (ECF No. 162) fares no better. There is little information directed to the facts identified in Defendant's motion or his statement of undisputed material facts. Instead, she vaguely references allegedly discriminatory conduct, such as "repeated[] drug test[ing] and investigat[ions]," being "treated like a [c]riminal" or "bad monkey," and losing out on "[a]ccolade[s] [as] a known enemy of the [r]acist regime" at the BEP. *Id.* at 1. She further makes claims that she is owed millions of dollars in lost income. *Id.* at 2. "The scattered, incomplete, and vague nature of plaintiff's responses makes the work of the Court more onerous. It is not the burden of this Court to defend plaintiff against summary judgment. Instead, the burden is hers." *Lawrence*, 156 F. Supp. 3d at 156. In light of Plaintiff Joy's failure to comply with the Rule 56(c), the Court would be justified in deeming Defendant's statement of facts as admitted. *See, e.g.*, *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 312 (D.D.C. 2018). Nevertheless, "because 'strong policies favor the resolution of genuine disputes on their merits,'" *id.* (quoting *Jackson v. Beech*, 636 F.2d 831, 832 (D.C. Cir. 1980)), the undersigned has gleaned from Plaintiff Joy's responses the scant insight available and applied those in recommending a ruling below on Defendant's motion for summary judgment as to the merits of her claims.

2.     Disparate Treatment and Retaliation Claims

Plaintiff Joy's claims fall into three rough categories. First, there is what appears to be her principal claim, which relates to her suspension on December 5, 2003, termination in August 2004, and reinstatement in January 2006. Second are claims from the Amended Complaint based on conduct that occurred in that period during which Plaintiff Joy was not working at the D.C.

Facility. Third is a hodgepodge of remaining claims that includes some allegations of disparate treatment between officers at the D.C. Facility and the Texas Facility, as well as certain miscellaneous charges regarding changes to administrative requirements. Because Plaintiff Joy's primary claim—regarding her suspension and termination—requires more involved analysis, the undersigned will treat the latter two categories first.

a. *Claims Based on Conduct Occurring Between December 2003 and January 2006*

Defendant identifies a number of allegedly discriminatory or retaliatory actions that occurred during the time that Plaintiff Joy was not working at the D.C. Facility and argues that these cannot form the basis for cognizable Title VII claims. The incidents include allegations related to Commander Cooch's September 17, 2004 email (ECF No. 25, ¶ 13), as well as a number of allegations that concern the disparate treatment of officers at the D.C. Facility from officers at the Texas Facility—i.e., changing work hours (*id.*, ¶ 18); denying CCN numbers (*id.*, ¶ 23); failing to recognize officers at the D.C. Facility as federal police officers (*id.*, ¶ 24); prohibiting officers at the D.C. Facility from entering certain sections (*id.*, ¶ 46); denying reimbursement for liability insurance (*id.*, ¶ 47); hiring contractors to perform screening at the entrance to the D.C. Facility (*id.*, ¶ 50); asserting that officers at the D.C. Facility would be disciplined if they failed to act after observing an incident (*id.*, ¶ 52); and changing shift reporting times (*id.*, ¶¶ 62–63)—and other allegations as to assertedly retaliatory or otherwise discriminatory acts occurring at the D.C. Facility, such as ordering administrative leave (*id.*, ¶ 27); conducting a ceremony for promoted Caucasian officers (*id.*, ¶ 45); changing the promotion process (*id.*, ¶ 65); installing hidden cameras (*id.*, ¶ 41); denying officers "early out" retirement (*id.*, ¶ 53); and excluding officers from the Training Division (*id.*, ¶ 58). ECF No. 128-2 at 25. Plaintiff Joy also claims that she was prevented

76

from applying for a promotion in April 2005. ECF No. 25, ¶ 39. The Amended Complaint alleges that each of these occurred during the period that Plaintiff Joy was suspended or terminated.

To the extent that Plaintiff Joy responds to this argument, she asserts that, because she was reinstated and had her "time and tenure . . . returned," she was "never legally separated from the [BEP]." ECF No. 150 at 13; *see also id.* at 22, 24. She does not explain, however, how conduct occurring at the D.C. Facility while she was suspended or terminated and not, therefore, reporting to the D.C. Facility could constitute either disparate treatment of her based on her race or an adverse action against her for protected activity. Indeed, as to the promotion claim, Plaintiff Joy admits that, as a terminated employee, she was ineligible to apply for a promotion. ECF No. 128-6 at 23. Her assertion that, in April 2005, she "was no longer terminated" because she had "won [her] arbitration" is belied by the fact that the arbitrator's decision was not issued until July 25, 2005 (ECF No. 128-5 at 2) and her testimony that she was not reinstated until January 2006 (ECF No. 128-6 at 8–9).

Summary judgment should therefore be granted in favor of Defendant on any disparate treatment or retaliation claims based on these incidents.

b.      *Other Claims Unrelated to Plaintiff Joy's Suspension and Termination*

As noted, this group includes both claims premised on the alleged disparate treatment of officers at the D.C. Facility from those at the Texas Facility on the basis of race and of protected activity, as well as claims premised on certain administrative changes. The actions included in the first category—those that are claimed to be discriminatory because they occurred at the D.C. Facility but not at the Texas Facility—include contracting out certain functions previously performed by officers, including in the Communication Police Operations Center and at the doors to the D.C. Facility (*id.*, ¶¶ 10, 14, 15); eliminating the "two man rule" (*id.*, ¶ 21); depriving officers

77

of certain duties, such as issuing traffic violation tickets and conducting investigations (*id.*, ¶¶ 32, 48); failing to recognize officers at the D.C. Facility as federal police officers (*id.*, ¶¶ 34, 71); imposing new procedures for entering and exiting the D.C. Facility (*id.*, ¶ 35); and prohibiting D.C. Facility officers from the Communication Police Operations Center (*id.*, ¶ 40). The second category includes directives requiring the use of reflective vests (*id.*, ¶ 36); changing the promotion process (*id.*, ¶¶ 19), and prohibiting officers from participating in money shows (*id.*, ¶ 20).

As with Plaintiff Davis, Plaintiff Joy has failed to raise an inference of racial discrimination by comparing the treatment of officers at the D.C. Facility to the treatment of officers at the Texas Facility. Again, there is no competent evidence that the Texas Facility had a primarily Caucasian police force and no evidence from which a reasonable jury could determine that the officers at the Texas Facility were similarly-situated to those at the D.C. Facility. *See* Section III.B.1.c, *supra*. Moreover, the fact that the bulk of the conduct affected not only African-American officers, but rather all of the officers at the D.C. Facility, does not indicate that those actions were motivated by racial animus. *See id.* Any retaliation claims premised on similar logic fail for similar reasons, because Plaintiff Joy has not shown that the officers at the Texan Facility failed to engage in protected activity. *See* Section III.B.1.d, *supra*; *see also Carter-Frost*, 305 F. Supp. 3d at 74 (plaintiff failed to establish that identified comparators were "proper comparators because she include[d] no information . . . about [their] protected activity" and therefore could not succeed in retaliation claim based on differential treatment).

The remaining allegations fail to support an intentional discrimination or retaliation claim because they are not materially adverse actions. Rather, as discussed above, such administrative changes as those identified have been held not to be materially adverse. *See* Section III.B.1.b, *supra*; *see also, e.g.*, *Tridico*, 130 F. Supp. 3d at 28 (requiring police uniform, driving marked

78

police car, being assigned responsibilities below seniority level, and being isolated from information "are not enough to dissuade a reasonable worker from making or supporting a charge of discrimination"); *Sims*, 33 F. Supp. 3d at 11 (assignments that negatively affected work schedule not materially adverse). Nor does Plaintiff Joy present specific evidence of causation or attempt to show the "very close" connection between her protected activity and any materially adverse action that targeted her to raise an inference of a causal connection necessary for a retaliation claim. *See Breeden*, 532 U.S. at 273.

For these reasons, Defendant's motion for summary judgment as to claims based on these allegations should be granted.

### c. Claims Related to Plaintiff Joy's Suspension and Termination

Plaintiff Joy's claims regarding her suspension and termination require somewhat more analysis. Defendant argues that she has failed to exhaust any claim alleging discrimination in relation to her suspension on December 5, 2003 (ECF No. 128-5 at 16) and termination on August 20, 2004 (*id.* at 24; ECF No. 128-2 at 8–10). As discussed above, it is Defendant's burden to show failure to exhaust by a preponderance of the evidence. *See, e.g.*, *Mount*, 36 F. Supp. 3d at 80. Defendant has done so.[34]

Like Plaintiff Davis, Plaintiff Joy could choose one of two possible avenues in which to pursue her discrimination and retaliation claims at the administrative level: through the EEO procedure or the collective bargaining agreement's negotiated grievance procedure. *See, e.g.*, *Carter*, 241 F. Supp. 3d at 197–98. It is undisputed that the labor union that represented Plaintiff

---

[34] Defendant also asserts that Plaintiff Joy failed to exhaust her administrative remedies with regard to the allegation that Commander Cooch prevented her from applying for a promotion in 2005. ECF No. 128-2 at 14. However, he does so merely by citing Plaintiff Joy's deposition testimony that she did not file an EEO claim regarding that "supposed denial." *Id.* As noted previously, that is insufficient. There are two avenues in which a federal employee covered by a collective bargaining agreement can exhaust a discrimination claim. Defendant has not showed that Plaintiff Joy failed to use the negotiated grievance procedure to challenge the conduct.

Joy filed a grievance on her behalf regarding the investigation that led to her termination. ECF No. 128-5 at 2–15. Thus, Plaintiff Joy irrevocably elected to proceed pursuant to the negotiated grievance procedure rather than going the EEO route. *See, e.g., Koch*, 934 F. Supp. 2d at 268 ("An employee is deemed to have made his selection upon either filing an administrative complaint or a grievance, and that election is irrevocable."). However, she failed to raise allegations of racial discrimination or retaliation in that grievance, which is fatal to her claim here. The arbitrator's decision on her grievance shows that she raised five arguments challenging the investigation and eventual termination of Plaintiff Joy: (1) that the BEP violated her rights pursuant to *N.L.R.B. v. Weingarten*, 420 U.S. 251 (1975), when she was denied union representation at an investigatory interview on December 5, 2003 (ECF No. 128-5 at 4–5); (2) that the BEP could not sustain its burden of proof because the affidavits on which it relied in making its decision were "unreliable and unfair" (*id.* at 6); (3) that the BEP "violated the 45-day rule" of the collective bargaining agreement, which required that an investigation of an employee involving non-criminal conduct must be completed within 45 days of receipt of the original complaint (*id.* at 6, 12); (4) that the BEP violated her right to privacy regarding her medical records (*id.* at 6); and (5) that the BEP issued a disproportionately severe penalty in light of Plaintiff Joy's work record and the weak evidence against her (*id.* at 7). The arbitrator ruled in favor of Plaintiff Joy, finding that the BEP had violated both the 45-day rule and her rights under *Weingarten*, and ordered her to be "reinstated and made whole for her losses." *Id.* at 9–10, 12–15. However, the grievance did not raise any claim that the investigation or its aftermath were retaliatory or otherwise discriminatory. That is fatal to any argument that the claims were exhausted.

*Delaney v. LaHood*, No. 07-CV-471, 2009 WL 3199687 (E.D.N.Y. Sept. 30, 2009), is instructive. In that case, ten air traffic controllers were put on administrative leave and terminated

because of certain irregularities related to worker's compensation claims. *Id.* at *3–4. The air traffic controllers' union filed a grievance alleging that the terminated employees had not committed misconduct and that the discipline imposed was too severe. *Id.* at *4. The union did not raise any allegations of discrimination in its grievance or before the arbitrator. *Id.* at *4–5. The parties eventually reached a negotiated resolution with the help of the arbitrator, and the employees were reinstated. *Id.* at *5. Each of the ten then returned to work and began the EEO process, alleging, among other things, that their terminations had been motivated by discrimination. *Id.* The termination claims were ultimately dismissed by the EEOC because the plaintiffs had "elected to challenge their dismissal through the negotiated grievance procedures, which permitted them to raise allegations of discrimination, and thus could not maintain claims under [Title VII]." *Id.* at *6. They then filed an action in federal court. *Id.*

The district court granted summary judgment to the defendant on those claims. It reasoned that the plaintiffs had elected the grievance procedure, and that because the claims of racial discrimination "pertained to the same 'matter' addressed through the negotiated grievance procedure—plaintiffs' administrative leaves and removals"—they could not bring discrimination claims that originated in an EEO complaint in federal court: "Plaintiffs' argument fails under the plain language of 29 C.F.R. § 1614.301(a), which states that a complaint pertaining to the same matter raised through a union grievance may not later be filed with the EEOC 'irrespective . . . of *whether the grievance has raised an issue of discrimination*.'" *Id.* at *13–14.

Here, then, the grievance could have raised the issue of discrimination and retaliation in its challenge to Plaintiff Joy's suspension and removal. Its failure to do so has the effect of barring Plaintiff Joy from bringing the claims here because they were not raised in the grievance process and therefore could not have been exhausted, either through that process or through the EEO

81

process. *See, e.g.*, *Carter*, 241 F. Supp. 3d at 198–99 ("The bottom line is that [the plaintiff's] decision to file the union grievance committed her to exhausting through that procedure all legal claims arising from the set of facts underlying the grievance. Because she did not exhaust her hostile work environment and retaliation claims through the grievance process, she cannot bring them here."). For this reason, Defendant's motion for summary judgment should be granted as to Plaintiff Joy's claims regarding her suspension and termination.

Even if the claim were exhausted, Plaintiff Joy's suspension and subsequent termination could not support either a disparate treatment or a retaliation claim. As to disparate treatment, Defendant has "articulated a non-discriminatory reason for its action," *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)—the investigation's finding that Plaintiff Joy falsified medical records in connection with a worker's compensation claim (ECF No. 128-5 at 4–5). To show this reason is pretextual, Plaintiff Joy "must show that the explanation given is a phony reason." *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994), *quoted in Fischbach*, 86 F.3d at 1183. She points to the fact that she was reinstated pursuant to the arbitrator's decision. However, the arbitrator ruled on the purely procedural grounds that Defendant violated Plaintiff Joy's *Weingarten* rights and the collective bargaining agreement's 45-day rule; he did not address the substantive finding that Plantiff Joy had submitted false documents. ECF No. 128-5 at 9–15. To be sure, departure from required procedures "is a factor the trier of fact may deem probative and choose to consider in determining the true motivation behind [an adverse employment decision]." *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982). However, "[a]n employer's failure to follow its own regulations and procedures, alone, may not be sufficient to support the conclusion that its explanation for the challenged employment action is pretextual." *Fischbach*, 86 F.3d at 1183. Here, the violation of Plaintiff Joy's *Weingarten* rights and the 45-day rule does

not raise a genuine issue of material fact as to whether Defendant's explanation that she was suspended and fired for submitting falsified records was "phony." *Pignato*, 14 F.3d at 349; *see also Robinson Red Coats, Inc.*, 31 F. Supp. 3d 201, 214 (D.D.C. 2014) (defendant's alleged failure to follow termination procedures required by collective bargaining agreement, "without more, is insufficient for a reasonable jury to conclude that the proffered justification is a pretext").

Any retaliation claim based on the termination is also deficient, because Plaintiff Joy cannot show a causal connection between her protected activity and the adverse action. The record contains evidence of formal or informal complaints by Plaintiff Joy to management between May 5, 2001, and June 5, 2002. ECF No. 150-1 at 21 (correspondence from Department of the Treasury referencing a "formal complaint of discrimination filed on January 25, 2002"), 85 (June 5, 2002 memorandum from Plaintiff Joy stating, "[I]t is no secret that I have formal charges with the EEOC against several police managers here at BEP"), 122 (May 5, 2001 complaint by Plaintiff Joy of supervisory misconduct), 124 (Nov. 28, 2001 complaint by Plaintiff Joy of abuse of authority and retaliation). But the first putatively retaliatory conduct directed at Plaintiff Joy was her placement on administrative leave in December 2003, over one year later. ECF No. 128-4 at 17, ¶ 51; ECF No. 128-5 at 4, 16. That is not a sufficiently close temporal connection to raise an inference of retaliation. *See, e.g.*, *Lawson*, 271 F. Supp. 2d at 137.

### 3. Hostile Work Environment and Retaliatory Harassment Claims

Defendant is also entitled to summary judgment on Plaintiff Joy's hostile work environment and retaliatory harassment claims for many of the same reasons discussed in relation to Plaintiff Davis' similar claims. *See* Section III.B.2, *supra*.

Plaintiff Joy does not identify the conduct in the Amended Complaint on which she bases these claims. But none of the allegations for which there is evidentiary support, with the possible

exception of Commander Cooch's September 17, 2004 email and June 2, 2006 email, could be interpreted as facially discriminatory. First, as discussed above, neither is objectively racially hostile. Moreover, as to the September 17, 2004 email, not only was it not directed at Plaintiff Joy, but she was not even employed at the BEP at the time it was sent, having been terminated in August 2004. ECF No. 128-4 at 6, ¶ 25; ECF No. 128-5 at 27. It is true that the D.C. Circuit has "reject[ed] a *per se* rule against considering incidents alleged to have occurred while an employee was physically absent from the workplace" in analyzing a claim of a hostile or harassing work environment. *Greer v. Paulson*, 505 F.3d 1306, 1314 (D.C. Cir. 2007). However, in *Greer*, the court indicated that the sorts of conduct that can contribute to a hostile work environment must be directed to the employee, such as "harassment and hostile incidents . . . occur[ring] by telephone or in person during an employee's communication with her employer while she is not working or away from the office." *Id.* Here, the September 17, 2004 email was not a communication between Commander Cooch and Plaintiff Joy; it was not even sent to her (nor, for that matter, was the June 2, 2006 email).

Indeed, the vast majority of the allegations in the Amended Complaint were not directed at Plaintiff Joy but rather applied to all of the officers at the D.C. Facility. Actions that do not "single out" a plaintiff but are "indiscriminate as to the surrounding individuals" do not plausibly establish that they are directed at her because of her protected status. *Slate v. Pub. Defendant Serv. of D.C.*, 31 F. Supp. 3d 277, 307 (D.D.C. 2014). Rather, such actions generally "fail[] to satisfy the requirement that the hostile work environment be 'linked to the plaintiff's [race or other protected status].'" *Stewart v. Fed. Comm. Comm'n*, 279 F. Supp. 3d 209, 218 (D.D.C. 2017) (quoting *Slate*, 31 F. Supp. 3d at 306). Here, as discussed above, it is undisputed that the police force at the D.C. Facility included officers of other races, including Caucasians, and that it included

84

officers who had not engaged in protected activity. The allegations in the Amended Complaint not specifically directed at Plaintiff Joy, without more, cannot establish a hostile work environment or retaliatory harassment. *See, e.g., Ware v. Hyatt Corp.*, 80 F. Supp. 3d 218, 222 n.4 (D.D.C. 2015).

The only "more" available here is Plaintiff Joy's suspension and termination. Even together with the more generalized allegations in the Amended Complaint, Plaintiff Joy has not established harassment based on her race or her protected activity. As discussed above, Defendant has proffered legitimate non-discriminatory reasons that she was suspended and terminated. Moreover, cobbling those disparate incidents together would not allow a reasonable trier of fact to discern "a coherent hostile work environment." *Mason*, 811 F. Supp. 2d at 195.

For these reasons, Defendant's motion for summary judgment against Plaintiff Joy should be granted in its entirety.

## IV.   RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment as to Plaintiff Davis (ECF No. 127) be **GRANTED** and that Defendant's motion for summary judgment as to Plaintiff Joy (ECF No. 128) be **GRANTED**, and that Plaintiff Davis' motion pursuant to Rule 56(d) (ECF No. 149) be **DENIED**.

\*       \*       \*       \*       \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the

85

findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).


Date:  November 13, 2018

Digitally signed by G. Michael Harvey
Date: 2018.11.13 14:02:30 -05'00'

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE